**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF IDAHO**

In re:

**JAMES A. LITTLE and JAN R. LITTLE,**

               Debtors.

Case No. **24-00661-BPH**

**MEMORANDUM OF DECISION**

### I.     Introduction

In this Chapter 7 bankruptcy,[1] the Chapter 7 Trustee ("Trustee") filed a Motion to Approve a Settlement and Sale ("Sale Motion") on June 27, 2025.[2] The Sale Motion seeks approval of a sale of property to and settlement with Robert and Rochelle Oxarango (collectively, the "Oxarangos").[3] Objections to the settlement and sale were lodged by debtors James and Jan Little (together, the "Debtors") and interested parties Gretchen Hyde and Dinah Reaney (together, the "Sisters").[4] Responses to the objections were filed by Trustee and the Oxarangos.[5] For the reasons stated herein, the Court grants the Sale Motion.

### II.     Jurisdiction and Venue

Settlements and sales of estate property concern the administration of the estate, allowance or disallowance of claims against the estate, and liquidation of estate property. Accordingly, the instant dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(A)–(B), (N)–(O). Pursuant to 28 U.S.C. § 157(b)(1), this Court may hear, determine, and enter final orders and judgments in core proceedings. *Dunmore v. United States*, 358 F.3d 1107, 1114 (9th Cir. 2004). Accordingly, this Court has jurisdiction to adjudicate the dispute herein.

Venue is proper in the district where the underlying case is pending. 28 U.S.C. §§ 1391(b), 1409(a). The Debtors' bankruptcy case is pending before this Court. Accordingly,

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Doc. 46.

[3] A Settlement, Stipulation, and Sale Agreement ("Settlement Agreement") executed on June 27, 2025, is attached to the Sale Motion as Exhibit A.

[4] Doc. 52.

[5] Docs. 56 and 57.

venue is proper in this Court.

### III.    Background and Facts

#### A.    Little Family Ranch, Succession Planning, and the Oxarango's Acquisition of the Sisters' and Jim's Interests

Debtor James Little ("Jim") was born, raised, and worked on ranches his entire life. As a child, he and his siblings assisted their parents with the ranches. When his parents passed, the ranches and other assets were divided between Jim and his two siblings. Jim received Van Deusen Ranch, Inc. ("Van Deusen"). Due to disparities in size, Jim had to acquire certain interests held by his siblings to equalize the division of assets.

Jim has three daughters: Rochelle, Gretchen, and Dinah. In 2009, Jim was diagnosed with chronic obstructive pulmonary disease. Around this time, Jim and Gretchen discussed the future of the ranch, including either selling it or keeping it in the family. Rochelle and her husband Robert had a sheep operation in eastern Idaho. Gretchen suggested that Jim contact Rochelle and Robert to explore their interest in returning to Van Deusen.

During these preliminary discussions between Jim and the Oxarangos, the Oxarangos expressed an interest and willingness to operate Van Deusen with Jim. However, the Oxarangos explained that their willingness to work with Jim and "keep the ranch in the family" had limitations.[6] As the family members responsible for day-to-day operations and management, the Oxarangos did not want other family members, such as the Sisters, involved in management.[7]

Jim explained to the Oxarangos that a deal could be reached where the Oxarangos would buy out the Sisters' interests in Van Deusen, resulting in Jim and the Oxarangos jointly controlling management and operations of the ranch. Additionally, the Oxarangos would later acquire Jim's remaining interests and obtain "full ownership" of the ranch.[8] On Christmas Day in 2010, Jim disclosed to the entire family his plans to transition management and operations to the Oxarangos.[9]

A year later, Jim and his accountant developed valuations and spreadsheets which initiated a series of negotiations, transactions, and buyouts beginning in 2012 and continuing through 2015.[10] Ultimately, these transactions included two other entities: V Dot Cattle

---

[6] Adv. Doc. 37-2 at ¶¶ 4, 12, 14.  References to docket entries in *Oxarango v. Geile, et al.,* No. 24-06021-BPH, the adversary proceeding associated with Debtors' bankruptcy case, are denoted as "Adv. Doc.".

[7] Adv. Doc. 37-2 at ¶ 12.

[8] *Id.*

[9] Adv. Doc. 37-1 at ¶ 4; Adv. Doc. 37-2 at ¶ 4.

[10] Adv. Docs 37-10 at p. 24:5–6; 37-2 at ¶¶ 7–8; 21, p. 18 at ¶ 18.

Company ("V Dot") and David Little Family LLLP ("DLF"). Like many other ranching and closely held family businesses, the selection of business organizations was influenced by estate planning. Jim's parents created DLF in 1990 and contributed certain interests in Van Deusen and V Dot to it. DLF permitted Jim's parents to gift interests in entities to family members. DLF is comprised of 40 general partnership units. The general partner has control. The limited partners have no control despite having an ownership interest in DLF. Jim was the general partner in 2012. Rochelle, Gretchen, and Dinah each held a 24.22% in DLF as limited partners in 2021.[11]

In 2012, DLF had a 48.11% interest in Van Deusen and a 15.16% interest in V Dot.[12] As DLF's general partner, Jim controlled DLF's interests in Van Deusen and V Dot. Jim's individual interest in Van Deusen was 10.12%, and his individual interest in V Dot was 50.13%.[13] When combined, DLF and Jim's ownership interest in Van Deusen in 2012 was 58.23%. At that same time, DLF and Jim's combined ownership interest in V Dot was 65.29%.[14] As the general partner of DLF, Jim effectively had complete control of DLF, Van Deusen, and V Dot in 2012.

In 2012, the parties reached an agreement whereby the Oxarangos agreed to purchase the following interests from Jim and the Sisters:[15]

|                              | Van Deusen | V Dot    |
|------------------------------|------------|----------|
| Jim Little (Projected Buyout) | $579,000   | $858,400 |
| Gretchen Hyde                | $241,000   | $305,000 |
| Dinah Reaney                 | $241,000   | $305,000 |

The buyouts proceeded in phases with the Oxarangos buying out the Sisters' interests first. According to Jim's notes, at the closing for the Sisters buyout, the parties "[g]ot things done with some acrimony . . . . Int [sic] full opinions about pennies on the dollar that Gretch personally expressed. . . . It will take them time . . . . some time to heal those scars."[16] No one disputes that

---

[11] Adv. Docs. 21, p. 18 at ¶ 12; 24, at ¶ 12. All citations to the Complaint (Adv. Doc. 1) or Counterclaims (Adv. Doc. 21) are for facts that are either admitted in the answers, agreed to in the statement of undisputed facts, or sufficiently established by the evidence presented at the hearing. The Complaint and Counterclaims are also cited *infra* to describe the parties' positions.

[12] Adv. Doc. 35-3.

[13] Adv. Docs. 21, 19 at ¶ 13; 24 at ¶ 13; 35-2 at ¶ 1.

[14] Adv. Doc. 35-3 at ¶ 2.

[15] Adv. Docs. 35-3 at Ex. 1; 35-4; 37.

[16] Adv. Doc. 37-10 at 41:11–19. The acrimony continues today. During the initial hour of the hearing in this matter, Gretchen sat at counsel table and as time went on, she shook her head with increasing vigor and rolled her eyes when she disagreed with the testimony of a witness. Ultimately, the Court had to instruct Gretchen to restrain herself.

the Oxarangos completed this transaction and acquired the Sisters' interests.

Following completion of the first phase, Rochelle and Jim revisited the mechanics of how Jim's interests in Van Deusen and V Dot would ultimately be transferred to the Oxarangos. These discussions were influenced by the parties' specific concerns. For Jim, it was important that the ranch operations continue[17] and that Debtors receive a sufficient income stream to maintain their lifestyle.[18]

In order to accomplish these goals, Jim had to carefully consider his future financial security as well as the possibility that a long-term liability owed to him by the Oxarangos or one of the entities may undermine the viability of future operations. Further, if the stream of payments necessary to maintain his lifestyle exceeded either the Oxarangos' or V Dot's capacity to make such payments, his interest in ensuring the ranch continued as a "ranch" and stayed within the family could be undermined. Conversely, if the payments failed to maintain Debtors' lifestyle, they would be deprived of the economic security they needed.

Another relevant factor for Jim included the tax consequences associated with any sale or transfer. During the time period when the parties were evaluating how to structure the transaction, Jim's capital account in V Dot had a negative balance of approximately $500,000, and a sale would trigger tax consequences.[19] As an alternative to a sale, the parties seemingly agreed on a deal structure that provided Jim a guaranteed salary as consideration for his interests in V Dot.

For the Oxarangos, control required complete ownership. Their greatest concern was that after years of work, other family members with a minority interest could threaten their investment and work by undermining their overarching agreement with Jim. In light of this concern, the Oxarangos were not comfortable with an agreement that was dependent on a provision in a will or other estate planning document because these documents can be withdrawn or amended over time. To accommodate this concern, the parties negotiated options that afforded the Oxarangos an opportunity to acquire Jim's interests in V Dot and DLF following his death.

Ultimately, Jim and the Oxarangos executed a series of documents in or around April 2015. First, the Oxarangos agreed to pay Jim a total of $579,417.50 for Jim's shares of Van Deusen stock.[20] The Oxarangos paid $35,420 in cash and provided Jim a promissory note for the remaining purchase price, $543,997.50.[21] Additionally, Jim transferred 20 of his 40

---

[17] Adv. Doc. 37-10 at 113:4–7.

[18] *Id.* at 113:20–114:3.

[19] Adv. Doc. 37-2 at ¶¶ 17–18.

[20] Adv. Doc. 21 at 6, ¶ 46; 35-3 at Exs. 7–8.

[21] *Id.*

general partnership units in DLF to Rochelle.[22] Finally, at the same time, consistent with the parties' negotiations and agreements, Jim as "seller" executed two option agreements that granted the Oxarango Family Trust the right to acquire his remaining interests in V Dot and the remaining 20 general partnership units in DLF for $10.00 following his death.[23]

Following the completion of the transactions with the Sisters and Jim, the Oxarangos continued working on the ranch. Jim and Rochelle, as the general partners of DLF, effectively controlled Van Deusen and V Dot. Consistent with the parties' agreements, payments totaling approximately $1,100,000 were paid to Jim over the following years as a salary.[24] Additionally, the Oxarangos made the payments required by the promissory note they executed in connection with the Van Deusen acquisition.

As time went on and Jim's involvement with the ranch diminished, it became increasingly difficult to justify making payments to Jim that were characterized as a salary or wages. Sensitive to this issue, Jim, the Oxarangos, and Jim's accountant considered alternatives that would permit Jim to receive another income stream as a substitute for the "salary" that Jim initially negotiated to avoid the tax consequences of a sale. Their answer was to sell the Roseberry property to the Oxarangos.

In the seven years that followed the Oxarangos' agreement with Jim, the record suggests neither Jim nor the Oxarangos were confused about the terms of their agreement, which accomplished Jim's twin goals of transitioning control and ownership to the Oxarangos while providing Debtors a revenue stream. This changed in 2022 when the Debtors sued their daughter and son-in-law, the Oxarangos.

### B.    Parties' History of Litigation

### 1.    State Court Litigation

In 2022, Debtors accused the Oxarangos of undue influence and constructive fraud, alleging in part that Jim lacked the capacity to contract.[25] To date, the Oxarangos have successfully defended themselves against these claims. They moved for summary judgment in the state court action, and while awaiting a decision, Debtors developed a new theory for unwinding the transaction between Jim and the Oxarangos. By a letter to the Oxarangos in June 2023, Jim "revoked" the option agreements for lack of consideration.

In February of 2024, the Third Judicial District Court of Idaho ("State Court") granted the

---

[22] Adv. Docs. 21 at ¶ 35; 24 at ¶ 35.

[23] Adv. Docs. 24 at ¶ 32; 37-1 at ¶ 16; 35-4 at Ex. 2; 37-10 at p. 95:3–97:6.

[24] Adv. Docs. 37-1 at ¶ 9; 37-2 at ¶ 35.

[25] Adv. Doc. 37-5.

Oxarangos' summary judgment motion and dismissed Debtors' claims with prejudice.[26] In a thoughtful decision, the State Court made observations and findings that remain relevant here because the parties have a pending adversary proceeding that addresses many of the same issues.

First, the State Court observed that the matter came before it "roughly a decade, if not longer, after the Littles and Oxarangos formed a plan which would transfer complete ownership and control over the Littles' farm and ranching business from the Littles to the Oxarangos."[27] Later in its analysis, the State Court concluded:

> In the Court's view, nothing about that notation, nor the language of the option agreement, suggests any ambiguity as to what the agreement meant: V Dot's interests would be sold to the Oxarangos for $10 upon [Jim's] death, if it had not been previously bequeathed to them. Mr. Little was given substantial time to look at these documents, and he had the assistance of at least his accountant during the two meetings prior to their execution. This term did not change when presented with the actual option agreements that were executed. Indeed, the unchallenged option agreement regarding his Little Family Limited Partnership contained an identical clause regarding the purchase price.[28]

This conclusion is important because the validity of the options, whether the options lacked consideration, and revocation of the options remain disputed issues in the adversary proceeding.

Next, the State Court scrutinized the Roseberry transaction and concluded: "After closely examining the Roseberry transaction to check for signs of unfair advantage, from which susceptibility could be inferred, the Court does not see a genuine issue of material fact."[29] It went on to address various arguments and conclude that the Roseberry transaction would provide Jim with an ongoing revenue stream, independent of the payroll revenue stream that ended.[30]

Finally, and important here, the State Court observed:

> Mr. Little's own declaration never claims that he did not understand the nature and effect of the contract [for the Roseberry transaction], save for whether the number proposed was representative of fair market value. He claims he was worried for the ranch, but there is no evidence to suggest that his worry overcame his free will. Indeed, he did not appear to have a problem with the sales price until a family member spoke to him about it, and even then, he showed the wherewithal

---

[26] Adv. Doc. 37-8.

[27] *Id.* at 1–2.

[28] *Id.* at 11.

[29] *Id.* at 13.

[30] *Id.*

to contact his accountant to provide a valuation of the property. There is no
evidence to indicate that Mr. Little was left without any time or room to exercise
his free will in regards to the transaction.[31]

The State Court's observation here is relevant because there remain allegations of undue
influence in the pending adversary complaint.

In a separate lawsuit, the Sisters filed a complaint against the Oxarangos, which was also
dismissed.[32] Unhappy with dismissal, the Sisters appealed to the Idaho Supreme Court, which
appeal remains pending.[33]

## 2.    Debtors' Prior Bankruptcy is Dismissed

This is the Debtors' second bankruptcy filing in less than two years. They filed their first
bankruptcy petition under Chapter 11 in July 2023, just four months after the State Court
dismissed with prejudice their claims challenging the validity of the options and the Roseberry
Transaction. Having been unsuccessful in State Court, Debtors filed an adversary complaint
against the Oxarangos seeking a determination that revocation of the options was valid and to
avoid the transfer of and recover the Roseberry property. Ultimately, the issues raised in this
adversary proceeding were never considered because the United States Trustee moved to dismiss
the case shortly after the conclusion of the meeting of creditors.

Following a contested hearing, Debtors' first bankruptcy case was dismissed in part
because the Court found that Debtors filed their case for the purpose of avoiding a two-party
dispute (with the Oxarangos) and the filing did not have a valid bankruptcy purpose.[34] This Court
previously explained:

[I]n light of all the circumstances and the *Bootjack Dairy* decision, these factors
indicate Debtors filed their chapter 11 bankruptcy case without a valid bankruptcy
purpose. Debtors do not appear to be utilizing the bankruptcy court to obtain a
fresh start or reorganize their debts. Rather, Debtors' bankruptcy was filed in an
attempt to force the dissolution of V Dot, which Mr. Little operated with the
Oxarangos, and in an attempt to obtain a more favorable outcome in their ongoing
litigation with the Oxarangos. These alone are not valid purposes for filing
bankruptcy. . . .[35]

---

[31] *Id.* at 16–17.

[32] Adv. Doc. 37-4 at ¶ 5.

[33] *Id.*; *Hyde v. Oxarango*, Idaho Supreme Court Case No. 51625.

[34] Adv. Doc. No. 37-4 at ¶ 6; *In re Little*, Idaho Bankruptcy Case No. 23-00352-NGH, Doc. 98.

[35] *In re Little*, Idaho Bankruptcy Case No. 23-00352-NGH, Doc. 98 at 11–12.

The case was dismissed on February 9, 2024.

### C.    This Bankruptcy and the Adversary Proceeding

Eight months after their previous Chapter 11 case was dismissed, on October 2, 2024, Debtors filed the instant case under Chapter 7. Less than a month later, on October 30, 2024, the Oxarangos commenced an adversary proceeding against Debtors. In the adversary proceeding, the Oxarangos seek declaratory relief, specifically: a determination of the validity of the options and the impact of any purported revocation; damages for wrongful dissociation of V Dot, revocation of the options (if such revocation was legally effective), and their actions taken in reliance on the options; a determination that any debt owed to the Oxarangos by Debtors arising from the foregoing is nondischargeable; and attorneys' fees.[36] The Oxarangos calculate their monetary damages to be in the millions. The Oxarangos initially filed Claim No. 7 on December 20, 2024, in the amount of $3,283,103.50. On July 9, 2024, the Oxarangos amended their proof of claim, increasing the amount to $8,522,797.50.

Debtors answered the Oxarangos' complaint and counterclaimed on numerous grounds. Through their counterclaims, Debtors also seek a determination of the validity of the options and the impact of any purported revocation. They further seek: a determination that V Dot was required to be terminated under the terms of its partnership agreement upon the Debtors' first bankruptcy filing; a determination that the Oxarangos purchased Jim's interests in Van Deusen with funds from Van Deusen itself and thus the shares that the Oxarangos "purchased" are treasury stock rather than vested in the Oxarangos; damages for breach of fiduciary duty; and an accounting.[37] Debtors also plead an objection to the Oxarangos' proof of claim. Debtors moved for summary judgment in the adversary proceeding, which remains pending.[38]

Trustee has now been placed in the middle of this decade-long tale of succession planning, familial conflict, and litigation. Further complicating matters is that, by all accounts, there are sufficient assets in Debtor's estate to easily make a 100% distribution to all claimants other than the Oxarangos. In Trustee's view, the resolution of this case is dependent upon the validity and amount of the Oxarangos' claim, which in turn is directly intertwined with the validity of the options and any revocation that may have occurred.

If the options were not revoked, the Oxarangos' damages would probably be substantially smaller than asserted in their proof of claim, and the estate would control partnership interests subject to a $10 purchase option upon Jim's death, effectively rendering them unmarketable. If the options were revoked, the Oxarangos' damages would likely be much greater because they relied on their agreement with Jim. There is no dispute that underlying the agreements between Jim and the Oxarangos was the understanding that the Oxarangos would ultimately control the

---

[36] Adv. Doc. 1.

[37] Adv. Doc. 21.

[38] Adv. Doc. 35.

ranch and its operations. The parties' complaint, answer, and counterclaims detail the parties' disputes surrounding these issues.[39]

### D.   The Proposed Settlement and Sale

The Sale Motion contemplates the sale of estate assets to the Oxarangos, in their individual capacities and as trustees of the Oxarango Family Trust U/T/A dated April 1, 2015, along with compromising and settling claims between the estate and Oxarango. [40] Under the proposed transaction, the Oxarangos will pay the estate $590,868.35 and withdraw their proof of claim. The estate will sell, transfer, and convey to the Oxarangos Jim's interests in V Dot and DLF. Additionally, the estate and the Oxarangos will exchange mutual releases and settle all prepetition claims between Debtors and the Oxarangos. The estate will be dismissed from the adversary complaint. The assets to be sold are as follows:

1. Mr. Little's 54.28% ownership interest in VDot, which interest were previously general partnership units in VDot;
2. Mr. Little's 20 partnership units in the David Little Family LLLP, an Idaho limited liability limited partnership, which interest were previously general partnership units in DLF;
3. Mr. Little's 26.72% ownership interest in the DLF, which interest are limited partnership units;
4. the 22.5 acres listed in the Debtors' Petition and Schedules (Dkt. No. 1), more specifically described in Schedule 2 to Exhibit A hereto (the "Pasture"), and the Debtors' rights and interests in that certain Lease Agreement dated September 1, 2020, by and between the Debtors as "Landlord" and Robert L. Hyde and Gretchen J. Hyde, as "Tenant";
5. the Counterclaims asserted by the Debtors in the Defendants James and Jan Little's Answer to Complaint and Counterclaims (Adv. Dkt. No. 21) filed in the Adversary, to the extent that the Counterclaims accrued before the Bankruptcy Case was filed (the "Counterclaims");
6. any and all claims and rights related to that certain Option Agreement dated April 1, 2015 related to the DLF general partnership interest owned at that time by Mr. Little, and the Option Agreement dated April 1, 2015 related to the VDot general partnership interest owned at the time by Mr. Little (the "Options"); and
7. any and all other causes of action, legal or equitable rights or remedies, or claims of any nature whatsoever, held by the Debtors before the Bankruptcy Case was filed that the Debtors' claim to have against the Oxarangos, VDot, the DLF, and Van Deusen.

("Settlement Assets").[41]

---

[39] *See* Adv. Docs. 1; 20; 21; 24.

[40] Doc. 46 at 17–18.

[41] For purposes of defining the Settlement Assets, defined terms and attachments are given the meaning they possess in the Sale Motion at Doc. 46.

Trustee conducted a substantial investigation into the claims, counterclaims and underlying issues between the parties. He reviewed the dockets in the State Court litigation and Debtors' prior bankruptcy case. He analyzed the estate's claims against the Oxarangos as alleged by Debtors in the adversary proceeding and the Oxarangos' claims against the estate. He conducted an inspection of Debtors' assets, including a physical visit to the ranch. He engaged professionals including counsel and accountants and sought their advice.[42]

Based upon the Trustee's investigation and the analysis and advice of the estate's professionals, the Trustee negotiated the proposed settlement and sale with the Oxarangos. According to the Trustee, the negotiation was not easy. From the Oxarangos' perspective, paying $590,000, along with all their attorneys' fees incurred to date, just to obtain a result similar to the parties' prepetition negotiations and agreements is an exceedingly unfair outcome. Conversely, a better result for the estate is difficult to imagine. All claims will be paid in full, complex litigation will be resolved, and Debtor will retain his home and other assets.

If approved, the Oxarangos will obtain control of Van Deusen and DLF. Such a result is objectionable to the Sisters, who seemingly argue that the wholesale dissolution of entities, liquidation of assets, and distributions to themselves as limited partners in DLF is a better alternative for the estate. Strangely, Debtors also object to the Trustee's proposal, even though it achieves an outcome that is closely aligned with prior agreements between Jim and the Oxarangos.

### E.    Expert Report of Jeffrey S. Pickett

Prior to the hearing, the Debtors filed an expert report by Jeffrey Pickett ("Pickett") to respond to the Oxarangos' expert.[43] Pickett also testified at the hearing. While this Court found his testimony credible and his report instructive, the analysis performed by Pickett was in furtherance of the Sisters' "complete liquidation" scenario, rather than an analysis of the transaction before the Court.[44]

Rather than assess whether the settlement negotiated by the Trustee was an exercise of reasonable business judgment, Pickett testified that sale of the "entire operation"—including assets owned by V Dot and Van Deusen—represents a better outcome for the estate and parties.[45] When asked by this Court, Pickett agreed that he believed the Trustee would "step into the shoes of Mr. Little; he would cause all of Mr. Little's entities to sell all of the assets of these entities;

---

[42] *Id.*; Doc. 56.

[43] Doc. 58; Oxarangos' report filed at Adv. Doc. 37-3.

[44] Doc. 58 at p. 16 of 74 ("if the Chapter 7 Trustee is able to sell the entire business . . . .").

[45] Doc. 78 at p. 152. Such testimony does not strike the Court as a reasonable assessment of the Sale Motion, but rather mere furtherance of the Debtors' and Sisters' best-case-scenario thinking that only looks at assets, divorced from the existing partnership agreements and bankruptcy.

then he would pull all of that money in, use it to pay for things first and then distribute the rest to the shareholders."[46]According to Pickett, the liquidation of assets owned by the non-debtor entities controlled by Jim would net the Oxarangos more than they invested, pay all the creditors, and return Debtors a surplus.[47] Pickett conceded that he did not know how the Trustee would sell non-debtor assets to generate the millions his analysis was predicated upon.[48]

Pickett's analysis reflects Debtors' and the Sisters' self-interests, rather than the interests of the estate. At its best, it is a misguided attempt to place the interests of some family members, Debtors, and the Sisters above the interests of other family members—the Oxarangos. At its worst, it is a cavalier attempt by Debtors and the Sisters to usurp the role of the Trustee, substitute their judgment for that of the Trustee, and obtain a more favorable outcome in this forum following their defeats in state court. While the Court does not question Pickett's qualifications, he was asked to opine on a transaction involving the liquidation of non-debtor assets as an alternative to the transaction before the Court—the sale of the Settlement Assets. For this reason, the Court affords Pickett's testimony little weight.

### F.    Undisclosed Litigation Financing and Parties' Relationships

At the conclusion of the hearing, the Court questioned how Debtors were financing the ongoing litigation against the Oxarangos. After efforts to avoid the question proved unsuccessful, Debtors' counsel Adam Little disclosed the source of litigation funding. However, the Court remained confused regarding the relationships between Adam Little, entities Adam Little has an interest in, Debtors' creditors (including entities Adam Little has an interest in), and payment of the Sisters' legal fees by another third-party entity associated with Adam Little. To clarify the relationships between the parties' opposing the settlement, the Court entered an order directing disclosure of all sources of payment of the Debtors' attorneys' fees, including funding from entities associated with Adam Little.[49]

In response, Adam Little filed a declaration disclosing that in June 2023, Highland Livestock and Land Co. Ltd agreed to provide a loan to Debtors. The loan was used to pay Debtors' attorneys Johnson May PLLC. Adam Little is Secretary of Highland Livestock and Land Co. Ltd. and a shareholder. He is also representing Debtors in this case, despite not having any bankruptcy experience.

Later, in March 2024, Little Enterprises, LLLP agreed to pay 50% of the Sisters' legal fees associated with the Sisters' lawsuit against the Oxarangos. Adam Little is a general partner of Little Enterprises, LLLP. In November 2024, Highland Livestock and Land Co. Ltd provided a second loan to Debtors to cover the legal fees attributable to Johnson May, PLLC's

---

[46] Doc. 78 at 155.

[47] *Id.*at 159.

[48] *Id.*at 158.

[49] Doc. 75.

representation of Debtors in the adversary proceeding. Johnson May did not amend its Rule 2016 disclosure until September 22, 2025—six days after the hearing.[50]

Finally, the declaration discloses that Debtors filed bankruptcy to:

. . . trigger the required termination of V Dot partnership in order to access the equity value of that company. If necessary (and based on the assumption that Oxarangos would refuse to liquidate V Dot), Jim & Jan planned to pursue claims in state court post-bankruptcy to enforce the V Dot partnership agreement. (At that time, Jim and Jan planned to borrow funds with a lien on their house in order to fully pay the assumed outstanding Chapter 7 claims.)[51]

Notably, the declaration discloses Debtors hoped to accomplish in this bankruptcy precisely what they sought to accomplish in their prior dismissed bankruptcy—the dissolution of V Dot.[52] Such a result was explicitly characterized by the Court as an "invalid purpose."

## IV.    Parties' Positions

Years ago, this matter originated as a two-party dispute between Jim and the Oxarangos. It has now transformed into a four-party dispute with Trustee and the Oxarangos on one side, urging the Court to approve the Sale Motion, and Debtors and the Sisters on the other, urging the Court to deny the motion. Each party has submitted substantial briefing advocating their desired outcome. Under the umbrella of the proposed Sale Motion, numerous sub-disputes have arisen.

Debtors' and the Sisters' contentions can be distilled to one point: Trustee did not conduct an objective valuation of the Settlement Assets. While they advance a number of other arguments which the Court takes up below, at bottom, Debtors and the Sisters favor a result that has immediate economic benefits for themselves while ignoring the distinction between the estate's interest in the entities and the assets owned by those entities.

Trustee's response emphasizes the due diligence he conducted, including a review of the docket in the State Court litigation, the docket in Debtors' previous bankruptcy case, a detailed analysis of the Oxarangos' pending claims in the adversary, and a physical visit to Van Deusen, all culminating in negotiations with the Oxarangos over several months with the advice of counsel and accountants.[53]

Additionally, both Trustee and the Oxarangos emphasize the benefits to Debtors from

---

[50] Doc. 74.

[51] Doc. 77 at ¶ 17.

[52] *In re Little*, 23-00352-NGH, Doc. 98 at 9.

[53] Doc. 56 at 5–8; Doc. 70 at 00:54:26–00:55:40, 01:08:25–01:15:45, 02:35:17–02:42:12, 03:00:52–03:01:51.

this proposed settlement and sale. Trustee could take an easier route by waiting for a resolution in the adversary proceeding and then begin selling Debtors' nonexempt assets—including their residence—to satisfy claims. Instead, Trustee has crafted a compromise that allows Debtors to remain in their home while also resolving expensive and complex litigation that has spanned multiple years, multiple forums, and multiple bankruptcies.

## V.    Applicable Law and Analysis

Due to the long-running nature of this dispute and the many parties involved, the parties have advanced numerous arguments of variable quality. This Court will dispense with the threshold and third-party issues before turning to the merits of the Sale Motion.

### A.    Threshold Issues

#### 1.    Ownership of the Counterclaims that Trustee Proposes to Sell

Debtors assert the counterclaims are their individual property and not property of the bankruptcy estate. Conversely, the Oxarangos argue the counterclaims are property of the bankruptcy estate and thus saleable by Trustee. Debtors present no law in support of their argument, instead arguing, "[t]he Trustee has provided no analysis of whether the estate independently owns those claims . . . ."[54]

A bankruptcy estate is created upon commencement of a bankruptcy case and includes "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." § 541(a)(1). "'Legal causes of action are included within the broad scope of § 541.' Pre-petition causes of action are part of the bankruptcy estate and post-petition causes of action are not." *Krohn v. Glaser (In re Glaser)*, No. 18-1175, 2019 WL 1075613, at *2 (B.A.P. 9th Cir. Mar. 5, 2019) (quoting *Goldstein v. Stahl (In re Goldstein)*, 526 B.R. 13, 21 (B.A.P. 9th Cir. 2015)). To the extent applicable, state law controls when a cause of action accrues. *Id.* at *3 (citing *Cusano v. Klein*, 264 F.3d 936, 947 (9th Cir. 2001)). The Court's task, then, is to determine whether the counterclaims to be sold to the Oxarangos are prepetition or postpetition causes of action.

The Court initially notes that the Sale Motion only seeks approval of the sale of the counterclaims insofar as they "accrued before the [b]ankruptcy [c]ase was filed."[55] However, an examination of each counterclaim indicates that, except for the objection to the Oxarangos' proof of claim, each counterclaim arose before the petition date: October 2, 2024. Each claim arises out of a transaction that occurred between 2012 and 2015, with the exception of issues arising from the Roseberry property—which occurred in 2020. Accordingly, all claims existed "as of the commencement of the case" and are, therefore, property of the bankruptcy estate and may be sold by the Trustee.

---

[54] Doc. 51 at 15.

[55] Doc. 46 at 17.

## 2.      Reasonableness of the Sale Process

Debtors argue the private sale was unreasonable while the Oxarangos argue that the Trustee had the discretion to choose between a public auction and private sale, and that a private sale was more appropriate in this circumstance. "'A trustee's selection of bidding and sale procedures is a matter committed to the trustee's business judgment, to which the bankruptcy court . . . give[s] deference.'" *In re Frantz*, 534 B.R. 378, 387 (Bankr. D. Idaho 2015) (citing *Irish Pub Arrowhead Land, LLC v. Gillespie (In re Irish Pub Arrowhead, LLC)*, Nos. 13-1024 & 13-1043, 2014 Bankr. LEXIS 514, at *10 (B.A.P. 9th Cir. Feb. 6, 2014)). Additionally, both public auctions and private sales are contemplated by Rule 6004.

The Court finds Trustee's decision to opt for a private sale rather than a public auction to be a reasonable exercise of his business judgment. The Oxarangos point out that this transaction fully resolves the estate's litigation, simplifies administration, and moves the case towards closure in a single transaction and it does so without forcing Debtors out of their residence.[56] Such efficiency would be unlikely if the assets were listed at public auction. More importantly, as pointed out by both Trustee and the Oxarangos, the partnership interests are subject to transfer restrictions requiring the consent of the Oxarangos prior to a transfer.[57] The Oxarangos have been unequivocal about their unwillingness to consent to a transfer to anyone other than themselves.[58]

Finally, the Court has substantial doubts about the marketability of the assets to be sold in this transaction,[59] which include interests in closely held entities. The buyer would find themselves in business with the Oxarangos and, to a lesser degree, the Sisters. It is not surprising that Trustee privately negotiated with the Oxarangos. As the existing operators possessing the ability to withhold consent to a sale to an outside party, the Oxarangos were the party most likely to have an interest in acquiring the assets being sold. Additionally, they are the party with the greatest interest in buying the claims against them, likely in hopes of finding peace after years of litigation. It would be a difficult, time-consuming, and potentially fruitless exercise for Trustee to attempt to market and sell these assets at public auction.

Accordingly, a private sale is a reasonable exercise of Trustee's business judgment.

## 3.      Ipso Facto Termination Clause

Debtors argue that due to their prior bankruptcy filing, V Dot has terminated pursuant to provisions in its partnership agreement. Conversely, Trustee argues that (1) Debtors identified their interest in V Dot as personal property in their most recent petition; (2) Idaho partnership

---

[56] Doc. 57 at 17–18.

[57] *Id.* at 17; Doc. 56 at 2–3.

[58] Doc. 57 at 19.

[59] Doc. 70 at 00:43:42–00:44:06, 01:17:50–01:18:52, 01:26:38–01:27:38.

law does not permit termination of a partnership until after the partnership has wound up; and (3) the ipso facto termination clause in the V Dot partnership agreement is rendered ineffective by the Bankruptcy Code.

The Court agrees with Trustee and finds that the ipso facto termination clause in the V Dot partnership agreement conflicts with both Idaho partnership law and the Code, thus it is inoperative. Under Idaho partnership law, termination of a partnership requires more than an ipso facto clause deeming the partnership terminated upon occurrence of an event. The Idaho Supreme Court in *Mays v. Davis*, 967 P.2d 275, 277 (Idaho 1998), provided a concise summary of the process required for termination of an Idaho partnership:

> The dissolution of a partnership is the change in the relation of the parties caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business. A partnership is not terminated upon dissolution, but continues until the winding up of the partnership affairs is completed. Winding up is the process of settling partnership affairs after dissolution, and generally involves an accounting and liquidation of the partnership's assets.

(citations omitted); *see also* Idaho Code § 30-24-802.

Consistent with *Mays*, Trustee correctly contends "the Debtors' argument that V Dot is terminated has no merit because V Dot has not completed the winding up process . . . . [A]t most, the V Dot operating agreement would require the partnership to begin the winding up process upon the Debtor's bankruptcy filing."[60] Further, Idaho law contemplates a transfer of limited partnership interests while a limited partnership is in the process of winding up. Idaho Code § 30-24-702(c). The V Dot partnership agreement could not simply terminate the partnership upon Debtors' bankruptcy filing: at most, it could mandate that V Dot begin winding up. Even if it did, the V Dot limited partnership interest would still be transferable. Notably, Jim did not act in a manner consistent with this theory in the intervening months between his first bankruptcy filing and this one, having never attempted to initiate a windup.

Not only is the ipso facto termination clause of limited import under Idaho law, it is also inoperative under the Bankruptcy Code pursuant to § 541(c)(1)(B). That subsection provides, "an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement . . . that is conditioned on the insolvency or financial condition of the debtor, [or] on the commencement of a case under this title, . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." It is well established that "§ 541(c)(1) overrides *ipso facto* clauses 'in an agreement, transfer instrument, or applicable nonbankruptcy law.'" *Pearce v. Woodfield (In re Woodfield)*, 602 B.R. 747, 755 (Bankr. D. Or. 2019) (emphasis in original); *Movitz v. Fiesta Invs., LLC (In re Ehmann)*, 319 B.R. 200, 206 (Bankr. D. Ariz. 2005).

Under similar facts, the court in *Woodfield* found that "§ 541(c)(1)(B) speaks [ ] broadly of preventing forfeiture, modification, or termination of a property right" and found that the dissociation provisions were preempted and invalidated by the Bankruptcy Code. *Id.* at 755–56.

---

[60] Doc. 56 at 9.

The same is true here: any provision of the V Dot operating agreement purporting to modify Jim's interest upon his bankruptcy filing is rendered inoperative by § 541(c)(1)(B). Accordingly, under both Idaho and bankruptcy law, the ipso facto clause does not resolve this issue or diminish the value of this compromise.

### 4. Issues Specific to the Sisters

#### a. Breach of Fiduciary Duty

The Court is satisfied that the Sisters, as limited partners of the entities, may have a pecuniary interest in this transaction sufficient to confer standing to object as parties in interest.[61] However, the Court finds the Sisters' objections meritless. The Sisters argue (without citation to authority) that the fiduciary duty owed to them by Trustee is violated by this sale because it offers "an unduly discounted price to the Oxarangos, especially given the illusory nature of the 'damages' the Oxarangos claim."[62] Trustee responds that this argument was made without citation to any authority and that this sale conforms to Trustee's fiduciary duties as a general partner pursuant to Idaho Code § 30-24-409.

Ordinarily, the Court will not address arguments that are "too undeveloped to be capable of assessment." *Hibbs v. HDM Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001); *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929–30 (9th Cir. 2003). The Sisters have provided this Court with no authority to support their contentions. On that basis alone, the objection is subject to being overruled. However, to afford the parties and any reviewing courts a more robust analysis, the Court will consider the merits of the objection.

The Trustee does not owe an independent fiduciary duty to the Sisters that is breached by the Sale Motion. The Sisters have failed to cite any authority for the proposition that a Chapter 7 Trustee has an independent fiduciary duty to a limited partner when the Trustee liquidates a general partner's interest in the partnership. Even if the Sisters had cited authority for this proposition, the argument is specious under the facts presented here. The Sisters are currently limited partners in DLF with Jim and the Oxarangos, who have the general partnership interests and control. If approved, the Sisters' will retain their limited partnership interests, and the Oxarangos will become the sole general partner. While the Sisters may dislike the change in

---

[61] The Sisters filed a supplemental brief on standing following the hearing. Doc. 73. This Court is persuaded by the U.S. Supreme Court case cited in their brief. In *Truck Ins. Exch. v. Gypsum Co., Inc.*, 602 U.S. 268 (2024), the Court found that "Congress uses the phrase 'party in interest' in bankruptcy provisions when it intends the provision to apply 'broadly.'" *Id.* at 278 (quoting *Hartford Underwriter Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000). The Court stated, "the general theory . . . is that anyone holding a financial stake in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." *Id.* at 277–78 (quoting 7 *Collier on Bankruptcy* ¶ 1109.01 (16th ed. 2023)). Accordingly, this Court finds that standing as a party in interest is not demanding and the Sisters satisfy this standard because they are limited partners.

[62] Doc. 52 at 3.

control that will accompany the transfer, their subjective feelings about a transaction are not synonymous with a breach of any alleged duty.

Contrary to Sisters' arguments and assumptions, the partnership interest that is the subject of the sale has little value outside the existing partners. A stranger's interest in being partners—general or limited—with the Oxarangos or the Sisters would be tempered by the evident and public familial infighting. The Sisters favor a singular outcome: dissolution of entities, winding up, sale of assets, and distributions to them now rather than later. This outcome reflects the Sisters' self-interest, not the estate's interest.[63] Thus, the argument alleging a breach of fiduciary duty has no merit.

The Trustee is not required to liquidate property unless it is compatible with the best interests of the estate. *Piatt v. Solomon (In re Piatt),* 2008 WL 8444827, at *7 (B.A.P. 9th Cir. May 29, 2008) (when there is a surplus, the trustee must abandon property or present "legitimate, persuasive reasons to the bankruptcy court to justify his continued efforts to sell the property . . . ."). The outcome urged by the Sisters challenges this recognized principle. First, this statement is referring to estate property. Notably here, the Sisters are arguing the Trustee should exercise Jim's controlling interest in non-debtor entities to liquidate assets held by those entities, pay the entities' creditors, and then distribute the surplus to partners and equity owners, including themselves and Debtors.

Neither Debtors nor Sisters have proffered a persuasive rationale for the winding down, dissolution, and liquidation of the non-debtor entities. Doing so would have no benefit to the estate or its creditors. The Sisters are not creditors.  In essence, the Trustee would be liquidating excess surplus property for Debtors and the Sisters with no corresponding benefit to the estate. Pickett's lack of familiarity with these principles and failure to acknowledge the distinctions between estate property and non-debtor entity property illustrate the flaws in his analysis. Had Pickett considered these principles, he would have recognized the sale of the non-debtor assets by the Trustee in his capacity as the controlling member/partner of the non-debtor entities was simply not a result authorized by the Bankruptcy Code in these circumstances.

---

[63] Even if the Sisters presented authority that prevented a general partner from selling his interest, the Trustee is a creature of the Bankruptcy Code and owes his duty to the estate above all else. § 323(a). The Trustee owes a fiduciary duty to the entire creditor body and cannot hold any interest adverse to the estate. *Dye v. Brown (In re AFI Holdings, Inc.)*, 530 F.3d 832, 844 (9th Cir. 2008); *Goodwin v. Mickey Thompson Enter. Grp., Inc. (In re Mickey Thompson Enter. Grp., Inc.)*, 292 B.R. 415, 421 (B.A.P. 9th Cir. 2003) ("a trustee's fiduciary duty to maximize the assets of the estate trumps any contractual obligation that a trustee arguably may incur in the course of making an agreement that is not enforceable unless it is approved by the court"). While in analogous business reorganizations the Trustee owes a duty to shareholders, "[o]ne of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors." *Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 355 (1985). Sisters have demonstrated neither a breach of duty nor that their interests supersede that of the creditor body. Accordingly, even under their best case, this Court would likely find this point unpersuasive.

### b.    The Sisters' Rights to Notice and First Refusal

The Sisters argue that their rights to notice and first refusal are ignored by the contemplated transaction. The Oxarangos respond that the Sisters received notice of the sale through service of the Sale Motion, as evidenced by the Sisters' objection, and have had an opportunity to meet the Oxarangos' offer but have failed to do so.

Under Idaho law, a right of first refusal is "a potential buyer's contractual right to meet the terms of a third party's offer if the seller intends to accept that offer." *Tricore Invs. LLC v. Est. of Warren*, 485 P.3d 92, 117–18 (Idaho 2021) (cleaned up) (quoting *Nicholson v. Coeur d'Alene Placer Mining Corp.*, 392 P.3d 1218, 1222 (Idaho 2017)). Gretchen received notice of this sale.[64] Clearly Dinah also received notice, as indicated by the objection she filed with Gretchen. Despite having notice, the Sisters have taken no action to meet the Oxarangos' offer. More than 180 days have elapsed since the Sale Motion was filed with the Court and to date the Sisters have failed to make a competing offer. The right of first refusal is not a right to override the sale because the Sisters are unhappy with the purchaser or outcome. Rather, the right of first refusal is an opportunity to meet another's offer. The Sisters have failed to do so here.[65]

### B.    Standards for Settlement and Sale

No threshold issue prevents this sale. Accordingly, this Court turns to the merits. In *In re Arkoosh Produce*, 2003 WL 25273746, at *9 (Bankr. D. Idaho July 1, 2003), this Court provided a succinct overview of the standards applicable to hybrid settlements and sales:

> [I]t is inappropriate for the court to substitute its own judgment as to the wisdom of a proposed settlement for that of the trustee. *In re 110 Beaver Street P'ship*, 244 B.R. 185, 187 (Bankr. D. Mass. 2000). The court need not engage in an exhaustive analysis of the law and merits of each claim, or the likelihood of the outcome, as doing so would in large part defeat the purpose of settlement. *See In re Goldstein*, 131 B.R. 367, 370 (Bankr. S.D. Ohio 1991). Rather, the court's role is to ensure that the trustee has exercised proper business judgment in making the decision to agree to the proposed settlement, *Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson Entm't Group, Inc.)*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003), and that the settlement "falls above the lowest possible point in the range of reasonableness." *Beaver Street P'ship*, 244 B.R. at 187 (internal citations omitted).

> In this context, the business judgment rule requires the trustee's decision to be made "on an informed basis, in good faith and in the honest belief that the action

---

[64] Doc. 48.

[65] The Sale Motion was filed June 27, 2025. Sufficient time has elapsed for Sisters to present an alternative proposal and to date they have not done so. Indeed, Sisters' preferred alternative appears to be the liquidation of assets, winding down and dissolution of V Dot, and possibly DLF. This outcome will net the greatest return for the Sisters and subvert the prepetition agreements between Debtor and Oxarangos.

taken was in the best interests of the [estate]." *In re Dalen,* 259 B.R. 586, 609 (Bankr. W.D. Mich. 2001) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)). Assuming the trustee is properly informed of the relevant facts and has otherwise complied with the business judgment rule in reaching a tentative settlement, and that sufficient evidence of the trustee's compliance is put into the record, the court may focus its efforts on determining whether the settlement meets the four-part [*Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377 (9th Cir. 1986)] test.

The Court employs this general framework in its assessment of the Sale Motion.

### 1.  *A & C Properties* Factors – Rule 9019

Trustee argues that the *A & C Properties* factors favor approval of this transaction for the following reasons: his probability of success on the merits in the adversary proceeding is difficult to ascertain and the estate benefits from the certainty provided by this transaction; the extreme complexity of this litigation; the expenses, inconvenience, and delay associated with continued litigation of the adversary proceeding; and delivery of full payment to all creditors in the near term. The Court agrees.

To approve a settlement under Rule 9019, the Court must find that the compromise is fair and equitable. *A & C Props.*, 784 F.2d at 1381. *A & C Properties* set out the factors that courts in the Ninth Circuit consider in determining whether a proposed settlement is fair and equitable. *Id.* Those include:

(a) [t]he probability of success in the litigation;
(b) the difficulties, if any, to be encountered in the matter of collection;
(c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* In the situation of a hybrid sale and settlement, as is the case here, the *A & C Properties* factors are considered in addition to the business judgment rule. *Arkoosh Produce*, 2003 WL 25273746, at *9.

The Court first considers Trustee's likelihood of success on the merits in the adversary proceeding. However, "when assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required . . . . If the court were required to do more than canvass the issue, there would be no point in compromising; the parties might as well go ahead and try the case." *Spark Factor Design, Inc. v. Hjelmeset (In re Open Medicine Inst., Inc.)*, 639 B.R. 169, 181 (B.A.P. 9th Cir. 2022) (cleaned up) (quoting *Burton v. Ulrich (In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997) and *Suter v. Goedert*, 396 B.R. 535, 548 (D. Nev. 2008)).

Trustee advances that his probability of success in the adversary proceeding is

"unknown" due to the numerous potential outcomes discussed earlier.[66] Trustee emphasizes that this uncertainty is a reason to approve the Sale Motion. The Court agrees. Based on the history of this dispute and a brief analysis of the merits of Debtors' counterclaims, the Court finds that any position the Trustee could take against the Oxarangos would have a dubious likelihood of success.[67] Rather than expose the estate to potential liability and the expense of litigating the adversary proceeding, Trustee seeks to avoid that uncertainty through this transaction.

Second, the Court considers the difficulties to be encountered should Trustee prevail in the adversary proceeding. Trustee admits that there would not be much difficulty in collecting a judgment in the adversary proceeding because this litigation primarily involves the legal status of the ranch entities. Since the parties agree on this issue, this factor weighs against approval of the settlement.

Third, the Court considers the complexity of the adversary proceeding. This factor favors approval of the settlement. The adversary proceeding is at the summary judgment stage and has already generated over a thousand pages of pleadings, motions, and expert reports. The disputed factual issues in the adversary proceeding span over a decade, including two separate cases prior to this one and numerous potential witnesses. The legal issues involve factual disputes that are animated by family dynamics. Resolving such disputes is no easy task. Credibility becomes an important factor. Ultimately, it requires resolution of the long-running dispute over the validity of the options, the impact of any purported revocation thereof, and a final determination of which party controls the ranch.[68] The Court finds that these complex factual and legal issues favor approval of the settlement.

Fourth, the Court considers the expense, inconvenience, and delay necessarily attending continued litigation of the adversary proceeding. This factor favors approval of the settlement. The litigation associated with the issues to be settled here has cost hundreds of thousands of dollars, spanned years and multiple courts, with no near-term resolution in sight. Should the settlement be denied, the issues raised in the adversary proceeding would proceed to trial, estimated by the parties to require five days. The trial will include numerous witnesses and days of questioning, undoubtedly leading to further expense and delay. Alternatively, approval of the settlement would not only resolve the adversary proceeding but also conclude the bankruptcy case with full payment to creditors.

---

[66] Doc. 46 at 11.

[67] *See supra*, Part III.B–C.

[68] As noted above (*supra*, Part III.A.), the word "ranch" is a pregnant term in this context, composed of three different entities, but addressed by the parties as though it is a single entity. However, Jim currently only holds an interest in DLF and V Dot. Adv. Doc. 21 at 18–19. Importantly, DLF holds 48.11% of Van Deusen Ranch, meaning that whoever controls DLF also controls Van Deusen. In essence, the Sale Motion gives full ownership of V Dot to the Oxarangos, makes the Oxarangos the sole general members of DLF and the majority partners (with Sisters' holding limited partnerships and a minority interest), and allows the Oxarangos to control Van Deusen.

The Court acknowledges the probability of an appeal is high because Debtors and Sisters are not funding the litigation themselves. They have nothing to lose by appealing an adverse decision by this Court. Conversely, the Oxarangos are likely to appeal if they lose because they uprooted their lives in 2010 and have expended tremendous effort and expense in reliance on their agreements with the Sisters and Jim.[69] The Court finds that the expense, inconvenience, and delay involved with continued litigation of the adversary proceeding strongly favors approval of this settlement. An immediate appeal of this Court's decision approving the Sale Motion and vacating the trial will prove more cost effective for all parties involved than incurring the expense of trial and an appeal three to four months from now.

Finally, the Court considers the paramount interest of the creditors, which in this case favors approval of this settlement. The other creditors in this case could not ask for a better outcome than this transaction which results in immediate 100% payment of claims. Approval of the compromise pays all claims of the estate and may be "the only apparent means for the Trustee to liquidate the value" of Debtors' claims and interests for the benefit of the Estate. *Gibson v. Speier (In re Gibson)*, 2011 WL 4502044, at *7 (B.A.P. 9th Cir. Aug. 3, 2011). Further, the creditors benefit from the certainty and finality afforded by this transaction. Additionally, "no creditor ha[s] filed an objection to the settlement, and . . . no creditor appeared at the hearing to oppose the settlement." *Paulson v. Mitchell (In re Paulson)*, 2011 WL 3300082, *7 (B.A.P. 9th Cir. May 10, 2011). The only objections were filed by Debtors and Sisters, neither of which is a creditor. The Court finds that the paramount interest of the creditors is best served by approval of this transaction.

In its analysis, the Court also considers the interests of Debtors because of the surplus nature of this case and Trustee's repeated assertion that if this transaction is not approved, he may look to other assets including Debtors' residence. Jim has worked and improved the ranch over the course of his life and understandably wishes to see it passed down to the next generation in the way that he sees fit. At one time, this meant passing it on to the Oxarangos. Jim's outlook has changed, although the cause is unclear. At best, it is attributable to unexpected circumstances he has encountered with his health. At worst, the change is attributable to familial meddling. It is likely a combination of both. Irrespective of the cause, the Oxarangos were entitled to rely on, and did rely on, the agreements reached with Jim. Approval of this transaction provides for the expeditious and economical administration of this case and resolution of litigation that risks putting Debtors in a worse financial position than they are in now.  The *A & C* factors weigh in favor of approval.

---

[69] This Court is particularly troubled by Adam Little's efforts to fund litigation indefinitely. The Oxarangos pointed out that Adam Little's efforts to act as a witness and his ownership of a creditor entity may raise professional responsibility issues. Doc. 57 at 14. This Court ordered that Adam Little disclose the details related to compensation in its order at Doc. 74. Entities associated with Adam Little have evidently been funding this litigation including the original state court case, the Sisters' state court case, this bankruptcy, and the adversary proceeding. Doc. 77. Whatever the motive, this Court cannot find that there is any benefit to indefinite litigation over a global settlement today.

### 2.    Business Judgment Standard – § 363(b)

"In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test." 3 *Collier on Bankruptcy* ¶ 363.02(4). "[T]he business judgment rule requires the trustee's decision to be made 'on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the [estate].'" *Arkoosh Produce*, 2003 WL 25273746, at *9 (quoting *In re Dalen,* 259 B.R. at 609).

"[T]he bankruptcy court reviews the trustee's (or debtor in possession's) business judgment to determine independently whether the judgment is a reasonable one. The court should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms." 3 *Collier on Bankruptcy* ¶ 363.02(4). Further, "[t]he price to be paid should be 'fair and reasonable.'" *Id.* Additionally, the Court has "the ultimate responsibility to assure that optimal value" is realized by the estate. *Fitzgerald v. Ninn Worx SR, Inc. (In re Fitzgerald)*, 428 B.R. 872, 884 (B.A.P. 9th Cir. 2010) (citing *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*, 325 B.R. 282, 288–89 (B.A.P. 9th Cir. 2005)).

The Court is persuaded that Trustee has proposed this transaction in good faith and the sales price reflects the optimal value the estate could hope to realize in light of the familial discord that accompanies this case. Trustee has explained at length the due diligence involved with the crafting of this transaction. Trustee retained counsel and accountants to further advise him on the most effective way to resolve this estate, ultimately arriving at the transaction contemplated here. There is no indication, nor has it even been alleged, that Trustee has structured this transaction in bad faith.

Trustee has been thrust into a yearslong family dispute with a complicated legal and factual history. The dispute remains ongoing, and both sides are entrenched in their positions. In all or nothing litigation, the results for the estate are difficult to predict. Rather than potentially wait for years for litigated finality, this transaction eliminates the uncertainty for the estate. The Trustee's proposal has many benefits: (1) the withdrawal of over $9 million in claims against the estate; (2) a 100% distribution on all remaining claims; (3) likely payment of all administrative expenses; (4) potential surplus to Debtors; (5) promotion of judicial economy; and (6) the value to creditors of immediate payment over speculative future returns. It also avoids having the estate embroiled in a family dispute that involves a significant emotional component that may cloud or eliminate objectivity.[70]

The likelihood that Trustee could structure such an integrated transaction and simultaneously accomplish so many goals at once with a third-party purchaser is exceedingly low. While there is a theoretical possibility that a better deal could be reached, that possibility

---

[70] During the hearing, one party had difficulty managing their responses to witness testimony, illustrating how challenging it has been for this family where sisters and parents with the financial backing of a cousin are pitted against another sister and her husband who were chosen by Debtor to maintain and operate the ranch.

hinges on numerous assumptions, including a complete victory for Debtors in the adversary proceeding—a result that has invariably eluded them in three prior years of litigation before multiple courts. The estate could not seek a better outcome than 100% payment of claims and full resolution of the litigation.

In exchange for the powers, protections, and benefits conferred upon him by the Bankruptcy Code, Jim submitted his assets to the control of Trustee. Those assets included the partnership interests and legal claims related to control of the ranch and its operations. Trustee, in carrying out his duties under the Bankruptcy Code, was charged with administering Debtors' nonexempt assets, which include the partnership interests, but also include Debtors' residence. Trustee exercised reasonable business judgment when electing to liquidate Debtors' business interests rather than Debtors' residence.

### 3.    Ability to Sell Free and Clear – § 363(f)

The Court must consider whether Trustee may sell the partnership interests free and clear of other interests pursuant to § 363(f). Trustee notes that, "[t]he only co-owners of any of the Settlement Assets are the Oxarangos who own interests in the Ranch entities. Nonetheless, the sale is authorized under 11 U.S.C. § 363(f)(2) because the Oxarangos have consented to the sale by entering the Settlement Agreement with the Trustee."[71] No party has disputed that the Oxarangos are the only other owners of the partnership interests or that the Oxarangos have consented to this transaction. The Court agrees with Trustee and finds that the Oxarangos, as the only other owners of the general partnership interests, have consented to the sale of the interests, and thus the estate's partnership interests may be sold to the Oxarangos free and clear pursuant to § 363(f)(2). Therefore, a sale free and clear is permissible under both §§ 363(b) and (f).

### VI.    Conclusion

The saga of litigation and uncertainty over the future of Van Deusen ends here. Having concluded that no threshold issues precluded sale under the Sale Motion, this Court finds that both the *A&C* factors and the business judgment standard are satisfied. The Sale Motion results in an optimal outcome for the estate given the significant uncertainty and cost of this litigation. Accordingly, the Sale Motion will be granted. An Order will be entered separately.

DATED: December 10, 2025

HON. BENJAMIN P. HURSH
U. S. BANKRUPTCY JUDGE
SITTING BY DESIGNATION
U.S. COURTS, DISTRICT OF IDAHO

---

[71] Doc. 46 at 13. *See supra*, Part. III.A. and n. 68 for an explanation of how the entities composing the ranch are essentially transferred.