UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

In re:

**JAMES A. LITTLE and JAN R. LITTLE,**                Case No. **24-00661-BPH**

Debtors.

**MEMORANDUM OF DECISION**

I.      **Introduction[1]**

More than 15 years ago, debtor James Little ("Jim") commenced the first in a series of transactions that would provide for the orderly transition of the family ranch to his daughter Rochelle Oxarango and her husband Robert.[2] The ranch operation is comprised of assets owned by three non-debtor entities.[3] Pursuant to his thoughtful planning, Rochelle and Robert acquired interests in these non-debtor entities and entered option agreements to acquire Jim's remaining interests when he died.[4]  Rochelle and Robert relied on these agreements and have been responsible for Ranch operations since entering the agreements.

---

[1] Many of the operative facts relevant to this decision were established in a decision entered in the main bankruptcy case, *In re Little*, 24-00661-BPH, following an evidentiary hearing held in connection with the Trustee's Motion to Sell. Doc. 81 (Memorandum of Decision). To the extent those facts are germane to the issues presented here, the Court hereby incorporates its prior decision. Although incorporated, this Court provides additional citations to the record for the benefit of the parties and any reviewing court.

[2] Jim's spouse, Jan R. Little, is a joint debtor in this bankruptcy case.  However, from the information and testimony presented to the Court, it appears Jan played little part in the relevant actions at issue here, and as such, this decision focuses largely on Jim.

[3] Entities consist of the David Little Family, LLLP ("DLF"); Van Deusen Ranch, Inc. ("VDR"); and V Dot Cattle Company, LLLP ("V Dot") (collectively the "Ranch"). *Oxarango v. Geile*, 24-00661-BPH ("AP") Docs. 1, pp. 5, 8–10; 21, pp. 4, 6–8, 18, 22–23; 35-3, p. 14. None of the entities composing the Ranch are in bankruptcy or have ever been in bankruptcy, and their assets are not property of the estate.

[4] AP Docs. 1, p. 18; 21, p. 11.

1

Changes in Jim's health combined with advice from family members caused him to second guess the agreements in 2022. With their family's advice, encouragement, and support, Debtors and their daughters, Gretchen Hyde and Dinah Reaney ("Sisters"), have sought to claw back control of the Ranch or otherwise cause the liquidation of the non-debtor entities' assets in proceedings before the state court and this Court. Each court to consider the issues has denied Debtors and Sisters' requests for relief. Indeed, Debtors' prior bankruptcy was dismissed in part because it was filed in bad faith and tantamount to forum shopping.

While ordinarily dismissal for bad faith should signal the "end" to a debtor, Debtors filed a second bankruptcy and placed the same issues before this Court that Judge Hillen considered in their original bankruptcy. The Chapter 7 Trustee ("Trustee") entered a settlement and compromise with the Oxarangos that would pay all creditors' allowed claims in full and resolve the pending adversary proceeding between the estate and Oxarangos vis-à-vis the agreements between Oxarangos and Jim. Debtors and Sisters objected to the compromise.

Debtors argued that the Trustee should abandon the negotiated compromise and undertake the wholesale liquidation of the Ranch's assets, pay its creditors, use the remaining funds to pay claims in Debtors' case, and distribute the anticipated and significant surplus to Debtors and Sisters. Despite no prior participation in this bankruptcy, Sisters filed their own objection, laying bare Sisters and Debtors' interest in causing liquidation of the non-debtor entities without regard for the prior agreements Jim executed with Rochelle and Robert Oxarango or its impact on them.

During the contested hearing, this Court inquired how Debtors were financing the immediate litigation and future litigation that their counsel intimated would follow any approval of the compromise. Debtors' bankruptcy counsel initially avoided the question but, ultimately, the Court learned for the first time that Debtors' pro bono counsel and nephew, Adam Little ("Adam"), was loaning Debtors money to pay for bankruptcy counsel and expenses. Later, this Court learned Sisters were also paying their counsel with a loan from Adam. The loans were made through entities in which Adam has an interest.[5]

Upon learning of Adam's role as pro bono counsel and financier, this Court inquired about compliance with Fed. R. Bankr. 2016(b). Ultimately, this Court issued orders to show cause why Debtors, Sisters, Adam, Johnson May PLLC ("Johnson May"), and Jones, Williams, Fuhrman, Gourley, P.A. ("Jones") should not be sanctioned for their failure to comply with Fed. R. Bankr. P. 2016(b)(2), for filing this bankruptcy for an improper purpose, and participating in litigation tainted by bad faith, recklessness, or abuse of the bankruptcy process.[6]

---

[5] Debtors received funds from Highland Livestock and Land Company ("Highland"), of which Adam is secretary and a shareholder. Highland is also a creditor in this case. Sisters received funds from Little Enterprises, LLLP ("Enterprises"), of which Adam is a general partner.

[6] Docs. 84 ("Order to Show Cause"); 90; 97; 107.

A hearing was held on February 27, 2026. Appearances were noted on the record. Exhibits 1–11 and 100 were admitted. Jim, Adam, and Debtors' bankruptcy counsel Matthew Christensen testified.[7] The affidavits of Gretchen Hyde and Dinah Reaney at Docs. 109-1 and 109-2 were submitted in lieu of their testimony. Scrutiny of the record shows Debtors, Adam, and the Sisters abused the judicial process, did not act in good faith, and violated Fed. R. Bankr. P. 2016 and 11 U.S.C. § 329.

## II.   Jurisdiction

Bankruptcy courts have jurisdiction over all cases under Title 11 and all core proceedings arising under or arising in a case under Title 11. 28 U.S.C. §§ 1334; 157(b)(1). Among core proceedings are "matters concerning the administration of the estate." 28 U.S.C. § 157(b)(2)(A). The imposition of sanctions is a core proceeding. *McCandless v. United States Trustee (In re Carrera)*, 2016 WL 4400652, at \*5 (BAP 9th Cir. Aug. 16, 2016), *aff'd sub nom.*, *Vizconde v. Burchard (In re Vizconde)*, 715 Fed. Appx. 630 (9th Cir. 2017) (unpublished).

## III.   Transactions and Litigation between the Parties

Between 2009 and 2015, Debtors, Sisters, and Oxarangos entered a series of transactions that sought to transfer control of the Ranch from Jim to Oxarangos.[8] Around this time, the Oxarangos were living in Southeastern Idaho and owned a commercial sheep ranch.[9] Following his diagnosis with COPD in 2009, Jim approached the Oxarangos regarding their interest in owning and operating the Ranch.[10] The Oxarangos sold their sheep ranch and, with their children, moved across the state to Emmett to begin working on the Ranch in 2011 prior to purchasing the Sisters' shares in V Dot in 2012.[11] This was the first transaction associated with Jim's transfer of the Ranch to Oxarangos.

---

[7] Prior to the show cause hearing, Debtors' bankruptcy counsel for all relevant events, Matthew Christensen, left Johnson May and ceased representation of the Debtors. Debtors' substitute counsel, James May, was not involved in the underlying litigation and nothing in this decision should be attributed to him. This decision ultimately involves disgorgement of fees by Johnson May in connection with services provided by Mr. Christensen, and the phrase "Debtors' bankruptcy counsel" refers to Mr. Christensen rather than Mr. May who appeared at the show cause hearing on behalf of the firm.

[8] AP Docs. 1, pp. 4, 8–10; 21, pp. 4, 6–8, 18, 22–23; 35-3, p. 14. A later transaction involves the sale of additional property near Donnelly, Idaho ("Roseberry"), which occurred in 2020 and was later disputed by Jim and Sisters. AP Docs. 1, pp 12–13; 21, 9–10.

[9] AP Docs. 1, p. 4; 21, p. 3.

[10] AP Docs. 1, p. 4; 21, p. 3.

[11] AP Docs. 1, pp. 5–6; 21, pp. 3–4.

Jim potentially had a large negative capital account, which required careful planning to avoid incurring significant tax liabilities.[12] In April 2015, the Oxarangos purchased Jim and Jan's shares in VDR, and Jim assigned the Oxarangos 20 of his 40 general partnership shares in DLF.[13] At the same time, Jim and the Oxarangos entered option agreements to transfer Jim's remaining interests in V Dot to the Oxarangos for $10 upon his death if they were not devised through his will.[14] In 2020, the Oxarangos purchased another property, the "Roseberry Property," from Jim.[15]

Nearly seven years after the Ranch transactions, in March 2022, Debtors filed a complaint in state court against the Oxarangos alleging fraud, undue influence, lack of capacity, constructive trust, and seeking an accounting.[16] The Debtors alleged that Oxarangos had taken advantage of Jim because his "cognitive capacity was significantly declining," that he had been "duped" by the Oxarangos, and that he could not understand the terms of any of the prior transactions.[17] Oxarangos filed a motion for summary judgment,[18] but rather than respond to the motion, Debtors volunteered to dismiss their case, and the state court stayed the proceeding.[19]

After the state court proceeding was stayed, Debtors' nephew Adam began advising Debtors, specifically Jim.[20] With Adam's guidance, Debtors obtained new counsel.[21] Following the recommendations of Adam and new counsel, Jim directed new counsel to send Oxarangos a letter purporting to revoke the option contracts for the purchase of V Dot, which letter was sent on June 30, 2023.[22] Along with finding new counsel for Jim and increasingly playing an integral role advising him, Adam and his brother David caused their entity Highland to loan Jim the funds he needed to pay for the litigation against his daughter. Debtors executed a promissory

---

[12] AP Docs. 1, pp. 5, 70; 21, p. 4.

[13] AP Docs. 1, pp. 8–9; 21, pp. 6–7.

[14] AP Docs. 1, pp. 9–10; 21, p. 7.

[15] AP Docs. 1, pp. 12–13; 21, pp. 9–10.

[16] AP Doc. 37-5.

[17] *Id.*

[18] AP Docs. 1, pp. 16–17; 21, p. 11.

[19] AP Docs. 1, pp. 16–17; 21, p. 11.

[20] Doc. 77, pp. 2–3.

[21] Hrg. Tr., Doc. 121, p. 29.

[22] AP Docs. 1, p. 18; 21, p. 11.

note with Highland on June 27, 2023.[23] Debtors obtained additional principal from Highland in the amount of $65,000 on July 12, 2023.[24] Two days later, Debtors filed their first bankruptcy under Chapter 11 for the singular purpose of liquidating V Dot.[25]

### A. Debtors' Original Bankruptcy and Sisters' Litigation

As of July 14, 2023—the petition date of the Original Bankruptcy—Adam was serving as Debtors' legal advisor while an entity associated with him was a creditor in the case and had extended credit to Debtors to fund the bankruptcy and related litigation.[26] Debtors commenced an adversary proceeding against the Oxarangos seeking a declaratory judgment that the options were validly revoked and that Roseberry was fraudulently transferred under new legal theories premised on the same nucleus of facts as the state court case.[27]

Shortly after Debtors filed the Original Bankruptcy, the Sisters commenced state court litigation against the Oxarangos alleging various theories of breach of fiduciary duty related to the acquisition of the Roseberry property and other land.[28] Oxarangos responded with a motion to dismiss.[29] The state court granted the Oxarangos' motion and dismissed the complaint in its entirety on December 18, 2023.[30]

Three months later, Judge Hillen dismissed the Original Bankruptcy because he found

---

[23] Doc. 77, pp. 2–3, 8.

[24] Doc. 77, p. 9.

[25] *In re Little*, 23-00352-NGH ("Original Bankruptcy"); Doc. 98, p. 9. Debtors signed an engagement letter with Johnson May on July 11, 2023, which required a retainer of $40,000. Original Bankruptcy Doc. 10, p. 3.

[26] Original Bankruptcy Doc. 1, p. 27 (Highland listed as a creditor in schedules for $80,000). Adam did not file an application to employ but filed a disclosure of compensation where he disclosed receiving no compensation and did not acknowledge any connection to Highland. Original Bankruptcy Doc. 41.

[27] *Little v. Oxarango*, 23-06029-NGH, Doc. 1. This adversary proceeding was closed following dismissal of the Original Bankruptcy.

[28] Doc. 96-1, p. 30–31. These claims are largely unrelated to the objection filed to the Trustee's attempts to compromise through a Motion to Sell in the current bankruptcy case and are based on allegations that the Oxarangos usurped business opportunities from DLF.

[29] *See* Doc. 96-1, p. 32.

[30] Doc. 96-1, p. 32.

that the case was filed in bad faith.[31] Judge Hillen wrote, "[h]ere, the record clearly indicates Debtors' motivation in filing bankruptcy was their dispute with the Oxarangos."[32] Further, he noted that, "Debtors appeared to acknowledge that their chances of success in the state court litigation were slim . . . ."[33] Judge Hillen described evidence presented by the United States Trustee and Oxarangos that, "Debtors are solvent and do not appear to be in any financial distress . . . . Debtors are solvent and in stable financial condition, as their assets far outweigh their liabilities, and their monthly income exceeds their expenses."[34]

Judge Hillen also found that the Debtors had few creditors—most of which were owned by members of their family—and Debtors had not defaulted on any payments, let alone faced a collection action.[35] In response, Debtors presented arguments about Jim's health similar to those presented at the show cause hearing in this case.[36] Judge Hillen found, "Debtors' argument that they filed bankruptcy to deal with future health care expenses [is] pretextual."[37]

In conclusion, Judge Hillen held that the Debtors improperly sought to dissolve V Dot and continue their litigation against the Oxarangos and that "Debtors filed this bankruptcy in bad faith without legitimate purpose."[38] He concluded the bankruptcy was filed "in an attempt to obtain a more favorable outcome in their ongoing litigation with the Oxarangos."[39] He further concluded this was not a valid purpose for filing bankruptcy.[40]

### B. The Second Bankruptcy was Filed on October 2, 2024

Debtors filed their second bankruptcy under Chapter 7 on October 2, 2024.[41] On October

---

[31] Original Bankruptcy Doc. 98, p. 6.

[32] *Id.* at p. 8.

[33] *Id.*

[34] *Id.* at pp. 9–10.

[35] *Id.* at p. 10.

[36] *Id.* at pp. 11–12.

[37] *Id.*

[38] *Id.* at pp. 12–13.

[39] *Id.* at 12–13.

[40] *Id.*

[41] Doc. 1.

30, 2024, Oxarangos commenced an adversary proceeding against Debtors and Trustee seeking a declaratory judgment that the options were enforceable and that Jim breached his fiduciary duties by filing a bankruptcy petition and conspiring with Sisters to liquidate the entities.[42] Oxarangos also sought a determination of nondischargeability of their claims, as well as an award of attorney fees and costs.[43] On November 14, 2024, Debtors and Highland executed another promissory note to fund litigation in the adversary proceeding without filing the disclosure required by Fed. R. Bankr. P. 2016(b).[44]

On June 27, 2025, Trustee and Oxarangos entered into a settlement and compromise under Fed. R. Bankr. P. 9019. According to the agreement, the Trustee would sell all of Debtors' interest in the Ranch entities to the Oxarangos in exchange for a release of their claims against the estate and payment of $590,868.35.[45] Debtors and Sisters filed objections, including engagement of an expert to file a report and testify at a hearing on the sale motion.[46]

Notably, despite Judge Hillen's earlier ruling that filing bankruptcy to terminate V Dot was an improper purpose, Debtors made continual reference to the dissolution of V Dot in their objection and the adversary proceeding.[47] Debtors advanced the position that rather than sell the Debtors' interests in the Ranch, the Trustee was obligated to step into the shoes of the Debtor and direct the Ranch entities to liquidate their assets individually to maximize their value through dissolution.[48] Under Debtors' assessment, this would create a much greater surplus to Debtors and the DLF partners while terminating the Ranch.[49]

## IV.    Hearings on Objection to Approve Settlement and to Show Cause

### A.  Settlement Hearing

The Order to Show Cause was issued following statements by counsel at the hearing on Trustee's Motion to Sell. Midway through the hearing on approval of the settlement, Debtors'

---

[42] AP Doc. 1.

[43] *Id.*

[44] Doc. 77, p. 14.

[45] Doc. 46 ("Trustee's Motion to Sell").

[46] Docs. 51; 52; 58.

[47] Doc. 51, pp. 2, 11, 17–18; AP Doc. 35-1, pp. 10–13. Judge Hillen did not rule on the effect of the bankruptcy on the dissolution clause.

[48] *See* Docs. 51; 58.

[49] *See Id.*

bankruptcy counsel referenced a likely appeal.[50] This Court inquired as to how Debtors could pay for all of the endless litigation.[51] Debtors' bankruptcy counsel's initial response was unclear. He later clarified the response, but it remained uninformative.[52] Sisters' counsel pled ignorance, explaining he did not know how his fees were being paid by Sisters.[53] At the hearing, this Court reminded counsel for the Debtors that compliance with Fed. R. Bankr. P. 2016 was necessary.[54] Ultimately, Adam revealed that funding for the litigation was being provided to Debtors by entities associated with him.[55]

### B. Show Cause Hearing

Following this revelation, this Court entered an Order requiring Johnson May and Adam to file declarations disclosing any agreements between Debtors, Sisters, Adam, and any entity associated with Adam.[56] Adam filed a declaration revealing that Highland—a creditor in this case—made loans to Debtors to fund the state court litigation, file the Original Bankruptcy, and pay for their attorneys in the adversary proceeding.[57] Adam is secretary and shareholder of Highland.[58] Adam also disclosed that Enterprises is funding 50% of Sisters' payment obligations in their state court case against the Oxarangos.[59]

Collectively, the declarations reveal Sisters executed a promissory note with Enterprises on March 11, 2024, to pay for 50% of their litigation expenses.[60] After executing the promissory

---

[50] Doc. 78, pp. 214–15.

[51] Doc. 78, p. 215.

[52] Doc. 78, pp. 215–18.

[53] Doc. 78, p. 218.

[54] Doc. 78, p. 218.

[55] Docs. 77; 78, pp. 222–23.

[56] Doc. 75

[57] Doc. 77, pp. 3–4.

[58] Doc. 77, p. 3.

[59] Doc. 77, p. 3; Doc. 109-2. Case No. CV 23-23-0549. Adam is a general partner of Enterprises. It was recently disclosed that Enterprises is also funding Sisters' fees in this bankruptcy.

[60] Doc. 77, p. 3.

8

note, Sisters filed an appeal to the Idaho Supreme Court at the end of August 2024.[61] A few months later, in October, Debtors commenced their second bankruptcy, this time under Chapter 7.[62] Following the Court's review of the declarations, the record in this case, and the Original Bankruptcy, the Order to Show Cause was entered.[63]

At the show cause hearing, Jim testified regarding his medical issues and corresponding expenses.[64] This Court inquired about the exact relationship between Adam and Jim, and Jim testified that Adam acted as a go-between for Jim and his lawyers.[65] Adam was his primary contact for legal advice.[66] When Debtors' counsel asked Jim if "Adam has pushed [decisions regarding litigation] on you," Jim testified, "I wouldn't say Adam pushed on it. He offered it as a suggestion or kind of help I guess and alternatives."[67] Jim also testified that Adam and his daughter Gretchen are very involved in all aspects of his life, including medical care.[68]

Adam testified regarding his role advising Jim, starting in June 2023. He characterized his work as largely "secretarial": sorting through Jim's documents, scheduling meetings with attorneys, and attending calls.[69] Adam testified that his only financial interest in the lawsuits was the loans Jim had with Highland.[70] When asked by the Court, Adam could not recall a single instance where Jim did not follow his advice.[71]

Mr. Christensen testified that he became involved with the Debtors in April or May of 2023 in connection with the Original Bankruptcy.[72] Mr. Christensen testified that Adam was

---

[61] Doc. 96-1.

[62]  Doc. 1.

[63] Doc. 84.

[64] Doc. 121, pp. 13–21.

[65] *Id.* at pp. 22–23.

[66] *Id.*

[67] *Id.* at pp. 24–25.

[68] *Id.* at p. 24.

[69] *Id.* at pp. 28–32.

[70] *Id.* at pp. 32–36.

[71] *Id.* at pp. 38–39.

[72] *Id.* at pp. 40–41. Based on the timeline established by documents filed in this case, this testimony appears to be inaccurate. Mr. Christensen testified that he was contacted by Dean

involved in his representation of the Debtors from the first meeting and acted as an advisor.[73] According to his testimony, Mr. Christensen never substantively discussed legal issues with Adam alone.[74] Mr. Christensen acknowledged that the previous bankruptcy had been dismissed as a bad faith attempt to defeat the state court litigation, and that the V Dot termination was one of those efforts.[75]

Following the dismissal of the Original Bankruptcy, Mr. Christensen testified that Debtors filed this case without the intention to liquidate V Dot or litigate with the Oxarangos.[76]

---

Bennett, an attorney at Holland & Hart. However, Holland & Hart did not become Debtors' counsel until June 2023.

[73] Doc. 121, p. 42.

[74] *Id.* at p. 45–46. This Court's scrutiny of the billing records causes it to question Mr. Christensen's testimony. Several entries appear to reflect substantive discussions with Adam that do not involve the Debtors such as calls about discovery and trial dates, responses to the Trustee's Motion to Sell, calls about expert witnesses, drafting reports, preparing questions for hearings, discussing future litigation, and other vague time entries. Doc. 110, pp. 13, 28, 30, 32, 39.

[75] Doc. 121, pp. 46–50. Mr. Christensen again referenced the possibility of invoking the V Dot termination clause as evidence of good faith. This Court notes that § 365(e)(1) was intended to *protect* the debtor, not be used offensively. *Spieker Props. v. SPFC Liquidating Trust (In re S. Pac. Funding Corp.)*, 268 F.3d 712, 715–16 (9th Cir. 2001). Even if Mr. Christensen's argument was correct, Judge Hillen concluded that filing the bankruptcy was bad faith because it was essentially a two-party dispute and there was no proper purpose. Original Bankruptcy Doc. 98, p. 13; *Idaho Dep't of Lands v. Arnold (In re Arnold)*, 806 F.2d 937, 939 (9th Cir. 1986) (discussing the "amalgam" of factors for bad faith); *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 616 (BAP 9th Cir. 2014) (bad faith may be found when a two-party dispute may be resolved outside of bankruptcy).

While the Debtors, Mr. Christensen, and Adam point to financial distress as the impetus for this bankruptcy, the record does not support these assertions. While this Court is sympathetic to Jim's medical issues, the Oxarangos note equity in Debtors' residence was approximately $769,500. Doc. 1, p. 10. Setting aside the parties' dispute about whether Debtors were also receiving an additional $5,000 per month more than is reported on their schedules, Debtors have assets and means to pay for ongoing medical expenses. Similarly, the Oxarangos highlight that none of the creditors in this bankruptcy have claims related to medical debt. Doc. 121, p. 92. Under these circumstances, the Court may comfortably conclude that the bankruptcy serves solely as a vehicle to reach the non-debtor entities and attempt to dissolve V Dot.

[76] Doc. 121, pp. 50–52.

However, he testified that the Debtors anticipated the need to obtain a loan to pay claims.[77] The loan would be secured by their home.[78] He also testified that the bankruptcy filing would be used as a justification for dissolving V Dot.[79] Under the V Dot partnership agreement, a bankruptcy filing by a partner could trigger dissolution.[80] Mr. Christensen assumed that Adam would fund the Debtors' new loan secured by their home.[81]

Following the evidentiary portion of the hearing, Debtors urged this Court to compartmentalize the litigation and focus on the results in this bankruptcy and give less consideration to the parties' other litigation.[82] While Debtors attempted to distinguish this case from the original Chapter 11, they were unable to identify a precipitating event that drove this bankruptcy. Instead, Mr. Christensen's testimony demonstrates this Chapter 7 filing was merely the next step in Debtors' ongoing efforts to liquidate V Dot.

The Sisters' arguments focused on the recent Idaho Supreme Court appellate decision that affirmed the dismissal of their complaint against the Oxarangos. Sisters conceded, "the plain truth of it is the sisters would not have been able to pursue their claims and hopefully reach a decision on merit without the assistance of family members like David and Adam Little."[83] Unfortunately for the Sisters, there was no merit to their claims. The Idaho Supreme Court concluded they were frivolous.[84]

The Oxarangos argued that Debtors were solvent when they filed this bankruptcy case and none of the claims are related to medical expenses or the costs of assisted living.[85] They state that Debtors were not experiencing garnishment, foreclosure, or any other event that required a

---

[77] *Id.* at pp. 51–52.

[78] *Id.*

[79] Doc. 121, p. 52.

[80] *Id.*

[81] *Id.*

[82] Doc. 121, pp. 68–70, 71. This Court points out the irony that the Debtors now tout the fact that this case pays creditors 100%, despite vigorously opposing the Trustee's Motion to Sell. While they argue that their objections "clarified" the Roseberry note and resulted in the Debtors not being personally liable, the Court perceives those as invented issues. Doc. 121, p. 72; Doc. 56; Doc. 78, p. 220.

[83] Doc. 121, pp. 86–90.

[84] *Hyde v. Oxarango*, 2026 WL 478542 (Idaho Feb. 20, 2026).

[85] Doc. 121, p. 92.

bankruptcy filing and that the Debtors' only purpose was to terminate V Dot.[86] Oxarangos report that they have spent over $200,000 on attorney fees in this bankruptcy alone.[87]

While the hearing focused on Jim's financial difficulties, it also highlighted the significant financial consequences Oxarangos have suffered defending spurious litigation. This Court doubts that it was within either party's contemplation when Jim proposed to hand down the family ranch that it would result in his daughter incurring more than half a million dollars in attorneys' fees and costs litigating with him and her sisters.[88]

## V.  Analysis

### A.  Purpose of Sanctions and this Court's Inherent Authority

The power to sanction is an inherent power of the court and stems from the very nature of a court as a "strict functional necessity." *Zambrano v. City of Tustin*, 885 F.2d 1473, 1478 (9th Cir. 1989) (citing *Michaelson v. United States*, 266 U.S. 42, 66 (1924) and *Gompers v. Buck Stove & Range Co.*, 221 U.S. 418, 450–51 (1911)). "Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). "That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process,'" *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)), including "conduct before the court as well as actions beyond the court's confines." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021) (citing *Chambers*, 501 U.S. at 44 and *F.J. Hanshaw Enter., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001)).

When acting under its inherent authority to impose sanctions, a bankruptcy court must find either bad faith or willful misconduct. *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196 (9th Cir. 2003). When sanctions are awarded under the court's inherent power, the party's conduct should be found to be tantamount to bad faith. *Moore v. Lieff (In re Keegan Mgmt. Co., Sec. Litig.)*, 78 F.3d 431, 436 (9th Cir. 1996). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Id.* (quoting *Estate of Blas v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986)). "For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass." *Keegan Mgmt.*, 78 F.3d at 436. Bad faith has been held to include a bevy of actions, including assertion of potentially legitimate arguments for an improper purpose or in furtherance of the abuse of judicial process. *Fink v. Gomez*, 239 F.3d 989, 991–94 (9th Cir. 2001) (compiling cases).

---

[86] *Id.* at p. 93.

[87] *Id.* at p. 95.

[88] Doc. 119, p. 6.

Also under the inherent sanction authority, the bankruptcy court may impose sanctions against parties "who willfully abuse judicial processes." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980). This includes a "full range of litigation abuses." *Evon v. L. Offs. of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012) (citing *Chambers*, 501 U.S. at 55).

### B.  Sanctions under 11 U.S.C. § 105(a)

Section 105(a) is the statutory component of the bankruptcy court's inherent power to find contempt for bad faith. *Knupfer,* 322 F.3d at 1196. The inherent power includes the ability to sanction egregious conduct by parties under § 105(a). *Caldwell v. Unified Cap. Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 284–85 (1996). Included in this power is the ability to sanction parties for vexatious litigation tactics. *In re Volpert*, 110 F.3d 494, 500–01 (7th Cir. 1997) (citing *Rainbow Magazine*). Scrutiny of the record shows that this bankruptcy was filed for an improper purpose and, in light of Judge Hillen's prior ruling and the litigation between the parties, constitutes bad faith and an ongoing abuse of judicial process.

### 1.  Debtors sought the same or similar relief in the Second Bankruptcy that Judge Hillen declared improper in the Original Bankruptcy

Debtors' objective when filing this bankruptcy was identical to their prior bankruptcy. Debtors now argue that their expenses have increased and the 18 months between filings have fundamentally altered the Debtors' financial state, necessitating a Chapter 7.[89] The Oxarangos counter that Debtors have substantial equity in their home, there was no garnishment, and there was no attempted execution or other precipitating event that caused Debtors to file this case.[90] The record discloses no material change in Debtors' circumstances between the Original Bankruptcy and this bankruptcy.[91] Even if they did anticipate mounting expenses in the future, a Chapter 7 bankruptcy does nothing to address post-petition medical or assisted living expenses.[92]

Judge Hillen's analysis served as notice and warning that this bankruptcy court will not serve as an alternative forum for Debtors' ongoing dispute with Oxarangos. Ordinarily, in Chapter 7 cases with assets, a debtor's nonexempt property is sold, the proceeds are used to pay claims, and debtors receive a discharge. Debtors filed this Chapter 7 case with no intention of seeking this relief. Instead, this bankruptcy is merely procedural theatre necessary to achieve Debtors' ultimate goal: liquidation of V Dot. Mr. Christensen's testimony demonstrates that Debtors did not file this case to pursue typical Chapter 7 relief. Instead, Debtors and their

---

[89] Doc. 121, pp. 47–48.

[90] *Id.* at p. 93.

[91] Doc. 121, pp. 91–92.

[92] *Id.* at p. 92; 11 U.S.C. § 727(b) ("a discharge . . . discharges the debtor from all debts that arose *before the date of the order for relief under this chapter*. . . .") (emphasis added).

counsel ignored Judge Hillen's prior ruling, and once again filed bankruptcy to gain an advantage over Oxarangos.

Rather than permit the Trustee to liquidate the non-exempt equity in their home and pay claims like a typical Chapter 7 case, Mr. Christensen testified that Debtors planned to obtain a post-petition loan secured by their home, likely through their pro-bono-lawyer/nephew's entity.[93] The loan proceeds would presumably be turned over to the Trustee to pay claims in full to avoid the sale of their home by the Chapter 7 Trustee.[94] To the extent Debtors had the ability to obtain a loan secured by their home and could pay their creditors with the loan proceeds, a Chapter 7 case and trustee were entirely unnecessary.

Instead, filing bankruptcy was a performative act to allow Debtors to return to state court, file a new complaint against Oxarangos, and argue that the filing of bankruptcy by a partner forced a dissolution under their partnership agreement.[95] As Judge Hillen noted,

> Debtors do not appear to be utilizing the bankruptcy court to obtain a fresh start or reorganize their debts. Rather, Debtors' bankruptcy was filed in an attempt to force the dissolution of V Dot . . . in an attempt to obtain a more favorable outcome in their ongoing litigation with the Oxarangos. These alone are not valid purposes for filing bankruptcy. Moreover, these issues could, and should, be addressed by nonbankruptcy law.[96]

It was invalid in the Original Bankruptcy. It is equally invalid now. Beyond being improper on its face, it reflects an abuse of the bankruptcy process and a waste of judicial resources. It is the latest in Debtors' ongoing efforts to multiply proceedings, serially complaining V Dot must be liquidated for this or that reason.

### 2. After the case was filed, Debtors and Sisters' bad faith became increasingly evident

The counterclaims in the adversary proceeding and the objection to the Trustee's Motion to Sell were filed in bad faith and asserted for an improper purpose. Neither Jim nor Sisters want to be bound by their prior agreements with the Oxarangos.[97] Recognizing that the agreements have long since been effectuated, Jim and Sisters have filed three separate proceedings and an appeal that were not warranted by the facts or existing law, as evidenced by the prior state court

---

[93] Doc. 121, pp. 51–52.

[94] *Id.* at p. 52.

[95] Doc. 51, p. 17; AP Doc. 35-1, pp. 10–13.

[96] Original Bankruptcy Doc. 98, p. 12.

[97] *See* n. 110 *infra.*

rulings and dismissal of the prior bankruptcy.[98] Despite those rulings, the same or similar allegations have been recycled here. Change of circumstances alone does not explain the parties' refusal to recognize this Court's and the state court's prior rulings.[99]

Billing records reveal Debtors and Sisters coordinated their efforts in this case. Adam, Debtors' pro bono counsel, masterminded the parties' litigation against Oxarangos while also ensuring the parties could pay those attorneys with loans from Highland and Enterprises.[100] Adam and Johnson May spoke regularly.[101] Similarly, Adam was in regular contact with Jones.[102] Notably, billing records submitted for both Johnson May and Jones show the first person contacted by either firm was Adam.[103] In the billing entries for the bankruptcy, Adam appears the same number of times as the Debtors and was likely present during every meeting with the Debtors.[104] While Jones's billing entries are more limited, Adam participated in meetings to determine litigation strategy.[105]

These coordinated efforts produced Sisters' objection to the Trustee's Motion to Sell, an objection that was devoid of a factual or legal basis. As the Trustee noted, "[o]ther than these conclusory statements, the Debtors, Gretchen Hyde, and Dinah Reaney provide no further analysis or citation to any authority for why the assignment of the estate's interests in DLF to the Oxarangos violates any fiduciary duty the Trustee has to the other partners."[106] This Court has scrutinized the objection and can likewise discern no basis in fact or law that would support its filing.[107]

---

[98] *See* Original Bankruptcy Doc. 98; AP Doc. 1, pp. 67–88; *Hyde*, 2026 WL 478542.

[99] At the show cause hearing, counsel for Sisters seemed to suggest that still further litigation may be on the horizon as the Sisters apparently contend the Idaho Supreme Court flatly "ignored the precedent" in finding that the Sisters' argument was frivolous. Doc. 121, p. 89.

[100] Doc. 77.

[101] See AP Doc. 37-11, pp. 27–30.

[102] Exs. 1–8 (showing communications with Adam by Sisters' attorneys in many entries); Docs. 121, pp. 22–23, 42; 110, pp. 13, 28, 30, 32, 39.

[103] Docs. 109, p. 5; 110, p. 5.

[104] Doc. 110, p. 5; AP Doc. 37-11, p. 29.

[105] Doc. 109, p. 5.

[106] Doc. 56, pp. 10–11.

[107] Sisters' Objection to the compromise was barely five pages (including both caption and signature block) double spaced and without a single citation to authority, suggesting it was

neither the product of reasonable effort, nor warranted by existing law.

Sisters do not analyze the role of a general partner under DLF's partnership agreement nor Idaho partnership law. If they had, Sisters would have recognized that DLF general partners have essentially unchecked authority to manage the partnership and that the general partner does not violate their duty solely because they act in their own interest. Idaho Code §§ 30-24-409(a), (e) (2025). Doc. 52-3, pp. 4–5. Additionally, Sisters ignored basic rules of Idaho contract interpretation by urging the Court to find unambiguous provisions of the partnership agreement to be ambiguous. Under Idaho law, a contract is construed "in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument." *Potlatch Educ. Ass'n v. Potlatch School Dist. No. 285*, 226 P.3d 1277, 1280 (Idaho 2010) (quoting *C & G, Inc. v. Rule*, 25 P.3d 76, 78 (Idaho 2001)). The intent of the parties is to be determined from the words of the contract, which are not ambiguous merely because one party gave the words a different significance than their ordinary meaning. *Swanson v. Beco Const. Co., Inc.*, 175 P.3d 748, 752 (Idaho 2007).

While this Court did not press the issue of standing in its previous decision due to the limited requirements of standing as parties in interest, Sisters clearly do not have standing to bring claims against the Trustee. Generally, a limited partner may not sue for injuries to the partnership that diminish the value of the limited partner's interest. 68 C.J.S. *P'ship*. § 587 (2025). While partnership law is state-based, most states that have considered the issue have found that a limited partner does not have an individual claim for breach of fiduciary duty unless they suffered a unique injury. *Id*. (citing *Phillips v. Kula*, 667 P.2d 261 (Haw. 1983); *Weston v. Northampton Pers. Care*, 62 A.3d 947 (Pa. 2013); *Gandhi v. Sitara Cap. Mgmt., LLC*, 689 F. Supp. 2d 1004 (N.D. Ill. 2010); *Hodges v. Rajpal*, 459 S.W. 3d 237 (Tex. App. 2015); *Lenz v. Assoc. Inns. and Rests. Co. of Am.*, 833 F. Supp. 362 (S.D.N.Y. 1993)). Under Idaho law, "a partner may maintain a direct action against another partner . . . to enforce the partner's rights and protect the partner's interests, including rights and interests under the partnership agreement . . . or arising independently of the partnership relationship." Idaho Code § 30-24-901(a). However, "[a] partner maintaining a direct action under this section must plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited partnership." Idaho Code § 30-24-901(b). Sisters do not purport to bring a derivative action on behalf of DLF nor did they make the required pleadings necessary to do so.

In their subsequent brief on the issue of standing, Sisters fail to specify the anticipated injury from the sale. Sisters state, "the limited partners are greatly affected by the identity of the general partner(s). They submit that they will both be substantially affected by the sale and change of the identity of the general partners, not just in terms of management, reporting and other general power obligations, but decisions as to distributions and other financial issues." Doc. 73, p. 4. As the U.S. Supreme Court has established, "[a] speculative chain of possibilities does not establish that injury . . . is certainly impending . . . ." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Additionally, Gretchen Hyde alleged particular injury based on her lease of 22.5 acres of pasture that were included in the sale. Hyde alleges that, "it would at least threaten, as a practical matter, a pecuniary loss to Gretchen Hyde." Doc. 73, p. 3. A provision to inherit property in a

16

Sisters—who were otherwise strangers to this litigation—filed an objection threatening the Trustee with liability for carrying out his duties under the Code. It was not filed in good faith. Instead, it was part of a coordinated effort to undermine the Trustee's administration. This Court takes exception to a party's intervening in bankruptcy, under the guise of "party in interest," to needlessly increase costs for the estate and creditors. Doing so with meritless pleadings is particularly egregious. Under circumstances like these, such conduct cannot be countenanced. *See Koshklada v. Shoenmann (In re Koshkalda)*, 622 B.R. 749, 766 (BAP 9th Cir. 2020) (compiling cases where a party's harassing actions caused concern that it would needlessly increase expense or cause the estate to become insolvent).

Importantly, in the Original Bankruptcy, Adam did not disclose his connection to Highland and did not file an application for employment under § 327, yet it is clear that Adam is directing this litigation. [108] While the Debtors and Sisters attempt to characterize Adam as a mere advisor, both the billing records and the testimony demonstrate that Adam plays an outsized role in this litigation.[109] This Court takes a dim view of "pro bono counsel" coordinating litigation in multiple forums against a target defendant while his entities finance the litigation. Further, failure to disclose the dual role of pro bono counsel and financier is antithetical to the transparency bankruptcy proceedings demand.

### 3. Sisters' interests and Adam's advice do not clearly align with Jim's interests

Sisters likely desire to take back the Ranch and liquidate the non-debtor entities' assets to exploit their improved value. The assets owned by the non-debtor entities, primarily real property, have dramatically appreciated over the last 11 years, particularly if used for purposes other than grazing, farming, and agriculture.[110] Not surprisingly, Sisters would like to access the increase in value now, without regard to the impact that might have on the non-debtor entities' ranching operations and the Oxarangos.

---

will—let alone the mere promise that such a provision will be included—is only the expectancy of a right to possess in the future and is not a property interest. *McDonald v. Paine*, 810 P.2d 259, 261 (Idaho 1991). "Before the death of the ancestor, an expectant heir . . . has no vested interest or rights in the property that such person may subsequently inherit." 26B C.J.S. *Descent and Distribution* § 75 (2025).

[108] Original Bankruptcy Doc. 41.

[109] *See* AP Doc. 37-11, pp. 27–30; Doc. 77; Exhibits 1–8 (showing communications with Adam by Sisters' attorneys in many entries); Docs. 109, p. 5; 110, p. 5; Docs. 121, pp. 22–23, 42; 110, pp. 13, 28, 30, 32, 39.

[110] Doc. 78, pp. 140–41("[O]bviously, there's a lot of interest in ranchland now, and we just have to look at the market values out there, people who are moving here from other states to take their piece of, you know, wide open spaces. And it's a viable ranching community or area, but it's also -- there's a lot of other uses that could happen with that").

Adam testified that his singular motivation was helping Jim following a disturbing comment Jim made.[111] However, the record undermines Jim's commitment to the advice he was receiving, advice that made his adverse to his daughter. Jim testified,

> I can't. I want it [the litigation] to come to an end. You're exactly right. I just want to be out on the farm . . . and doing what [inaudible], but I'm stuck here . . . . Well, I'm going along with what they -- the lawyers have told me and looking into the liquidation of V Dot Cattle as a source of funds. And it's a tough situation.[112]

When asked by this Court about what he wanted to happen to the non-debtor entities that comprise the Ranch, Jim stated, "[w]ell, I'm kind of torn. I'd like to see it continue. I think the Oxarangos have put a lot of effort into it . . . . I've got to figure out a way to have – to pay the expenses. And this Parkinson's was an unplanned situation."[113]

While Jim was concerned about his expenses, the record shows his family pressured him into the untenable position of having to either honor his agreement with Rochelle or follow recommendations that served the Sisters' interests at Rochelle's expense. Adam played a significant role in this dynamic. Jim and Adam acknowledged that Jim always followed Adam's advice.[114]

Given Jim's testimony and demeanor at the hearing, expressing a certain ambivalence about pursuing this course of conduct, this Court has its own doubts about the adequacy of the representation Jim has received in this case. This Court harbors concerns that Jim's advisors—who are self-interested family members—have given him advice influenced by family dynamics, history, and other interests. Jim's testimony suggests he has been at best a reluctant participant.

The record before this Court shows that efforts to transition the Ranch to the next generation have devolved into litigation tainted by bad faith and an abuse of the judicial process before three different courts in five different proceedings. Adam's and Sisters' conduct is exactly the sort of "officious intermeddling" that the court's inherent powers to sanction abuse of process and its precursors were designed to combat.[115] This bankruptcy was filed for an improper

---

[111] Docs. 77, p. 1; 121, p. 27.

[112] Doc. 78, p. 219.

[113] *Id.* at pp. 219–20.

[114] Doc. 121, p. 22–23, 39.

[115] While third-party funding has its place in litigation, it may also be used as a tool of oppression. For instance, the common law concepts of champerty and maintenance recognize that outside actors can have a deleterious impact on justice. Champerty is "an officious intermeddling in a suit by a stranger by maintaining or assisting either party with money or otherwise to prosecute or defend it" while maintenance is "an officious intermeddling in a suit that in no way belongs to the intermeddler, by maintaining or assisting either party with money

purpose, to exert leverage on Oxarangos and set the stage for a non-debtor dissolution in state court. Further, Debtors and Sisters' objections to the Trustee's compromise were not intended to further the purposes of bankruptcy. To the contrary, the singular purpose was to recklessly seek the liquidation of the non-debtor entities to the detriment of Oxarangos. Accordingly, exercise of this Court's inherent power is warranted, and sanctions are appropriate against Debtors, Sisters, and Adam.

### C.  Failure to Disclose under Fed. R. Bankr. P. 2016 and 11 U.S.C. § 329

Johnson May and Adam's failure to comply with the mandates of § 329 of the Bankruptcy Code and Fed. R. Bankr. P. 2016 compunded the bad faith and abuse of judicial process because the precise arrangements between Debtors, Adam, and Johnson May were not timely disclosed. Section 329 requires in part that "[a]ny attorney representing a debtor . . . shall file with the court a statement of the compensation paid or agreed to be paid . . . and the source of such compensation."

This statute is implemented by Fed. R. Bankr. P. 2016(a), which requires that the entity seeking compensation must file an application and send a copy to the United States Trustee ("UST"). Additionally, any time that a new payment agreement is negotiated, it must be disclosed within 14 days. Fed. R. Bankr. P. 2016(b)(2). Debtors' counsel's supplemental disclosure filed almost ten months after the new fee agreement was entered did not comply with Fed. R. Bankr. P. 2016(b)(2), which required disclosure within 14 days.

The bankruptcy court has the authority and an independent duty to monitor and regulate compensation to a debtor's attorney "notwithstanding the absence of objections by the trustee, debtor or creditors." *In re Gilsvik*, 673 B.R. 745, 751 (BAP 9th Cir. 2025) (quoting *Lobel & Opera v. United States Trustee (In re Auto Parts Club)*, 211 B.R. 29, 33 (BAP 9th Cir. 1997)). Courts have been unanimous in holding that the disclosure requirements are strictly construed, "even if the results are sometimes harsh." *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re*

---

or otherwise, to prosecute or defend it." 14 C.J.S. *Champerty and Maintenance* §§ 1–2. The primary difference between the two is whether the third party receives a benefit. *Id.* at § 4. *See* Jason Lyon, *Revolution in Progress: Third-Party Funding of American Litigation*, 58 U.C.L.A. L. Rev. 571, 575 (Dec. 2010) ("The common law doctrines of maintenance and champerty were developed 'to prevent officious intermeddlers from stirring up strife and contention by vexatious and speculative litigation which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of law.'") (quoting 14 Am. Jur. 2d *Champerty, Maintenance, and Barratry* § 1 (2009)); *In re Turkey Antitrust Litig*, 727 F. Supp. 3d 756, 765 (N.D. Ill. 2024) (recounting that maintenance and champerty were used to harass and inflict financial or political injury, to aggrandize the estates of the financier, or to "'pervert[] the remedial process of the law into an engine of oppression.'") (quoting 4 William Blackstone, *Commentaries* at 1354). While Idaho did not formally adopt these concepts, their goals are recognized in abuse of process and malicious prosecution. *See Wolford v. Tankersley*, 695 P.2d 1201, 1222 (Idaho 1984) (Bistline, J., dissenting).

*Park-Helena Corp)*, 63 F.3d 877, 881 (9th Cir. 1995).

These requirements are "mandatory, not permissive." *Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 848 (BAP 10th Cir. 1997) (cleaned up) (quoting *Turner v. Davis, Gillenwater & Lynch (In re Invest. Bankers, Inc.)*, 4 F.3d 1556, 1565 (10th Cir. 1993)); *Hale v. United States Trustee (In re Basham)*, 208 B.R. 926, 930–31 (9th Cir. BAP 1997) (citing *Peugeot v. United States Trustee (In re Crayton),* 192 B.R. 970, 981 (9th Cir. BAP 1996)). Once the bankruptcy court determines that an attorney has violated § 329 and Fed. R. Bankr. P. 2016, the bankruptcy court has the authority to order the attorney to disgorge all of the attorney's fees. *In re Blackburn*, 448 B.R. 28, 43 (Bankr. D. Idaho 2011) ("The state of the law is clear—an attorney who neglects to meet the disclosure requirements of § 329(a) and Fed. R. Bankr. P. 2016(b), even if inadvertently, forfeits the right to receive compensation for services rendered and may be ordered to return fees already received."). Indeed, the Tenth Circuit has held that "full disgorgement is [not] always appropriate for failure to disclose under § 329[,] [b]ut it should be the default sanction, and there must be sound reasons for anything less." *SE Prop. Holdings, LLC v. Steward (In re Stewart)*, 970 F.3d 1255, 1267 (10th Cir. 2020).

"Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees." *Park-Helena*, 63 F.3d at 882 (citing *In re Maui 14k, Ltd.*, 133 B.R. 657, 660 (Bankr. D. Haw. 1991)). The caselaw is clear that filing an inaccurate disclosure statement "is appropriate basis for the total disallowance of compensation by counsel.") *In re Grimmett,* 2017 WL 2437231, at *10 (Bankr. D. Idaho Jun. 5, 2017), *aff'd* No. 1:17-cv-00266-EJL (D. Idaho Feb. 16, 2018); *see also Hale,* 208 B.R. at 931; *Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040, 1045–46 (9th Cir. 1997); *Park–Helena Corp.*, 63 F.3d at 881–82. "Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny." *Christopher v. Mir (In re BOH! Ristorante, Inc.)*, 99 B.R. 971, 972 (BAP 9th Cir. 1989) (quoting S. Rep. No. 95-989, 9th Cong. 2d Sess. 39 (1978)).

"Debtor's counsel must lay bare all its dealings regarding compensation. Counsel's fee revelations must be direct and comprehensive. Coy, or incomplete disclosures are not sufficient." *Park-Helena*, 63 F.3d at 881 (cleaned up) (quoting *In re Bob's Supermarket's, Inc.*, 146 B.R. 20, 25 (Bankr. D. Mont. 1992)). Although Johnson May made its initial disclosure on the petition date (October 2, 2024), stating that it would receive a flat fee of $6,838, it entered a new agreement six weeks later dated November 25, 2024.[116] This new agreement was not fully disclosed until almost a year later, on September 22, 2025, after inquiry by the Court.[117]

Johnson May's supplemental disclosure explained that the firm will represent Debtors in

---

[116] Doc. 3.

[117] *Id.*

the adversary proceeding.[118] It also stated that the source of compensation is both Debtor and Other, "Debtors are responsible; Debtors are borrowing funds from Highland Livestock & Land Co."[119] The promissory note for this loan was executed on November 14, 2024.[120]

The record shows that Debtors' bankruptcy counsel's fees were paid via check from Highland Livestock and Land Co."[121] Ultimately, at least 88.8% of the funds Debtors' counsel received for its services were paid directly by Highland to counsel.[122] The September 2025 disclosure contradicted statements by counsel at the hearing, during which Debtors' bankruptcy counsel affirmatively represented to this Court, "[t]he debtor is paying my fees . . . . it's the debtor who is paying me my fees. Where his [sic] is obtaining the funds to do that isn't information that I am necessarily privy to, and so I can't answer that question."[123]

The importance of transparency in bankruptcy cases cannot be overstated. *In re Aquilino*, 135 F.4th 119, 125 (3d Cir. 2025) ("our bankruptcy system demands openness and transparency"). Johnson May failed to comply with the rules and its failure obscured Adam's role in this case. Oxarangos, the Chapter 7 Trustee, the UST, and this Court had a vested interest in knowing the precise contours of the relationship between Debtors, Highland, and Adam as soon as the November engagement letter was entered. Instead, only in response to specific questions by this Court and its Orders to Show Cause did the parties learn Adam was simultaneously pro bono counsel for Debtors, an advisor to Sisters, and indirectly financing all the litigation through Highland and Enterprises.[124]

Even accidental failures may result in denial of all fees. *Park-Helena Corp*, 63 F.3d at 882. Johnson May explained at the show cause hearing that its failure to file the updated disclosure was an oversight. As noted by *Park-Helena*, even where the results may be harsh, the disclosure requirements are strictly construed. Given the paramount importance of transparency and disclosure, the requirements of Fed. R. Bankr. P. 2016 are not served by an arbitrary exercise

---

[118] *Id.*

[119] *Id.*

[120] Doc. 77, p. 14.

[121] Doc. 76.

[122] Doc. 76. Debtors' counsel was paid $6,838.00 in the bankruptcy and $54,170.71 for the adversary proceeding as of the time of the updated disclosure.

[123] Doc. 78, p. 217–18.

[124] This Court notes that it has taken Johnson May five separate filings following the hearing to arrive at the point where this Court finds that the *majority* of the transactions have been disclosed. Docs. 73; 76; 95; 101; and 110.

21

of discretion that results in only partial disgorgement.

While the results are harsh, the circumstances of this case highlight the necessity of disclosure early in a case. If Fed. R. Bankr. P. 2016 had been complied with, this Court, Oxarangos, the Chapter 7 Trustee, and UST may have realized sooner that this case was tainted with bad faith and an abuse of process. As a result, Johnson May shall disgorge and pay to Debtors $70,517.50 and any other amounts collected under the engagement agreement filed at Doc. 74.[125] Johnson May is prohibited from collecting any further fees or costs under the agreement filed at Doc. 74.

## VI.    Allocation of Sanctions

Following the hearing to show cause, this Court asked the Oxarangos to submit a summary of the attorneys' fees incurred throughout the litigation. According to their disclosures, Oxarangos have incurred fees and costs defending against Debtors and Sisters' frivolous litigation totaling approximately $552,000.[126] Under an objective analysis, Oxarangos were forced to incur fees defending and enforcing agreements with Jim that were negotiated and performed years earlier.

On October 4, 2024, just two days after this petition was filed, the state court awarded Oxarangos attorneys' fees of $93,986.[127] This intervening bankruptcy precluded Oxarangos' enforcement of this award. Oxarangos did not object to Debtors' discharge and seemingly have no interest in litigating with Jim—Rochelle's father. However, this Court has an independent interest in discouraging litigation that is frivolous, pursued in bad faith, and abuses the judicial process.

The conduct before this Court is particularly troubling given the prior award of fees by the state court and Judge Hillen's prior dismissal of Debtors' Original Bankruptcy, in part, for bad faith. Despite these outcomes, Adam and Sisters cavalierly charged ahead, encouraging Debtors to file a second bankruptcy as part of a ploy to manufacture grounds for a dissolution of the non-debtor entities. They then opposed the Trustee's Motion to Sell, arguing a non-debtor entity should be liquidated instead and that failure to do so was a breach of the Trustee's duties. Under these circumstances, only a significant sanction is likely to deter such conduct.

As previously noted, Jim was prepared to dismiss the litigation prior to Adam's involvement. Instead, Jim relied on Adam's advice. As the adviser, coordinator, and indirect financier of these proceedings, Adam shall be sanctioned in an amount equal to the Oxarangos' legal fees and expenses incurred in this case and adversary proceeding. Sisters shall be jointly and severally liable with Adam for a portion of the attorneys' fees corresponding to their

---

[125] This amount is reflective of the latest disclosure filed by Johnson May. Doc. 110.

[126] Doc. 119, p. 6.

[127] Doc. 119, pp 14–29.

objection.[128]  Based on the Court's review of the disclosures, Oxarangos are entitled to an award of fees as follows:

1.  $111,079.50 for fees and costs incurred in this bankruptcy.
2.  $166,700.89 for fees and costs incurred in the adversary proceeding.

Collectively, Oxarangos are entitled to a total award of $277,780.39, comprised of (1) and (2) above, as a sanction for Adam, Sisters, and Debtors' bad faith, frivolous filings, and abuse of the judicial process. Absent such an award, there exists the real probability that Adam and Sisters will continue to ignore court rulings, gin up new theories based on the same underlying nucleus of facts, and act without regard to the consequences their actions have on the courts or parties.

## VII.   Conclusion

Judge Hillen's decision dismissing Debtors' Original Bankruptcy could not have been clearer. The state court awarded attorneys' fees to Oxarangos, but Adam, Debtors, and Sisters remained undeterred. Despite prior decisions by those courts, Debtors and Sisters—with Adam's advice, coordination, and financing—brazenly argued that this Court should ignore decisions by the state court and Judge Hillen and indulge this third attempt to obtain the same relief based on the thinnest of veneers. Despite that veneer, the relief was neither different nor new. Instead, it was further bad faith and an ongoing abuse of the judicial process which can only be discouraged by imposing sanctions.

A separate order will be entered.

DATED: May 1, 2026

HON. BENJAMIN P. HURSH
U. S. BANKRUPTCY JUDGE
SITTING BY DESIGNATION
U.S. COURTS, DISTRICT OF IDAHO

---

[128] According to their disclosure at Doc. 119, Oxarangos incurred $45,869.70 in fees in responding to the objections to the Trustee's Motion to Sell. Because of the coordination between the parties, this Court finds it fair to attribute half of this expense to Sisters. Accordingly, Sisters and Adam will be jointly and severally liable for $22,934.85—which was determined by dividing $45,869.70 by two.